## In re FLORIDA EAST COAST RY. CO.
### No. 4827.

District Court, S. D. Florida,
Jacksonville Division.
Oct. 19, 1943.

See, also, 49 F.Supp. 527.

Davis, Polk, Wardwell, Sunderland & Kiendl and Edgar G. Crossman, all of New York City, for petitioning creditors.

Russell L. Frink, of Jacksonville, Fla., for reorganization trustees Scott M. Loftin and John W. Martin.

John B. L'Engle, of Jacksonville, Fla., for debtor Florida East Coast Ry. Co.

Frank P. Fleming, Guy W. Botts, Giles J. Patterson, and Henry P. Adair, all of Jacksonville, Fla., White & Case, of New York City, Stockton, Ulmer & Murchison, of Jacksonville, Fla., John G. Jackson, of New York City, Osborne, Copp & Markham, Charles Cook Howell, Charles Cook Howell, Jr., and Milam, McIlvaine & Milam, all of Jacksonville, Fla., Percival E. Jackson, of New York City, John A. Bussian, of Chicago, Ill., Frank E. Bryant, of Miami, Fla., Pitney, Hardin & Ward, of Newark, N. J., and J. Henry Blount, of Jacksonville, Fla., for intervenors.

STRUM, District Judge.

Florida East Coast Railway Company operated under an equity receivership in this court from August 31, 1931, until January 25, 1941, when reorganization proceedings were instituted under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205.

As of December 31, 1940, the debtor railway's capitalization was:

| | |
|---|---|
| Capital stock outstanding... | $37,500,000.00 |
| First mortgage 4½% bonds, due January 1, 1959 | $12,000,000.00 |
| First & refunding mortgage 5% bonds, due September 1, 1974 | $45,000,000.00 |
| Equipment trust certificates, series "H" 4½% | $ 180,000.00 |
| | $94,680,000.00 |
| Receivers' liabilities on said date: | |
| Receivers' equipment trust certificates, series "I" 3% | $ 1,116,000.00 |
| Total capitalization and Receivers' liabilities.. | $95,796,000.00 |

As of December 31, 1940, the receivers had on hand cash aggregating $1,301,857.37. Interest on the First Mortgage 4½% bonds and on all equipment trust certificates was currently paid. Interest on the 5% First & Refunding bonds (due $1,125,000 semiannually) was in default since September 1, 1931, aggregating $21,375,000 on December 31, 1940. Unsecured indebtedness aggregated $2,688,668.32, plus interest. Potential unliquidated liabilities, disputed and in litigation, were about $750,000.

After hearings pursuant to 11 U.S.C.A. § 205(d) the Interstate Commerce Commission certified to this Court for consideration a plan of reorganization (252 I.C.C. 423, 453, 731) based upon the following capitalization:

| | |
|---|---|
| Equipment notes | $ 1,992,000.00 |
| First mortgage series A bonds,—to holders of present 4½% First Mortgage bonds | $12,000,000.00 |
| General mortgage series A bonds,—to holders of present 5% First & Refunding bonds | $ 4,500,000.00 |
| Common stock (no par) 450,000 shares,—to holders of present 5% First & Refunding bonds | $18,508,000.00 |
| Total capitalization .... | $37,000,000.00 |

In addition to the $12,000,000 of New First Mortgage bonds to be distributed to present First Mortgage bondholders, the proposed new First Mortgage authorizes the issuance of an additional $6,000,000 in bonds for new capital expenditures. This amount includes $500,000 in "free bonds,"

to be issued upon resolution of the new Board of Directors, and to be used for any proper corporate purpose, the aggregate limit of bonds under the new mortgage being $18,000,000 unless enlarged by a vote of 66⅔% of all outstanding bonds under the new mortgage.

The matter is now before the court for consideration of objections to the proposed plan, interposed by the holders of approximately 80% of the First & Refunding bonds and by the holders of about 6% of the First Mortgage bonds. No creditor has appeared in support of the plan.

Since the Interstate Commerce Commission considered the debtor's financial condition and formulated the plan now before the court, substantial and unforeseen improvements in the affairs of the debtor have developed as follows:

(a) Earnings have greatly increased over prior years, as shown below:

| Year | Net Railway Operating Income | Total Income Available for Fixed Charges and Contingencies |
|---|---|---|
| 1939 | $ 743,699 | $ 810,899 |
| 1940 | $ 985,219 | $ 994,131 |
| 1941 | $1,580,527 | $1,601,964 |
| 1942 | $7,873,959 | $7,985,400 |
| 1943[1] | $9,004,940 | $9,141,860 |

(b) As a result of these increased earnings, the cash position of the reorganization trustees as of October 1, 1943, is as follows:

| | |
|---|---|
| Cash ...................... | $14,288,433 |
| Less obligations against above | $ 224,678 |
| | $14,063,755 |
| Cash, special deposits awaiting determination of mortgage liens ...................... | $ 546,446 |
| War bonds purchased for tax anticipation purposes....... | $ 3,000,000 |
| Due Trustees on traffic balances, net .................... | $ 185,164 |
| Total cash, or equivalent, October 1, 1943 ....... | $17,795,365 |

(c) Since the present plan was formulated, interest coupons maturing September 1, 1931, March 1, 1932, and September 1, 1932, on the debtor's First & Refunding 5% bonds, have been paid in the aggregate sum of $3,375,000. Interest on the First Mortgage 4½% bonds have been paid in full to June 1, 1943. Outstanding equipment notes have been reduced to $1,226,000.

 The 1942 and 1943 earnings above shown are abnormal and temporary. They are not regarded by the Court as a sound basis for capitalization of the new company. Indications are, however, that the present rate of earnings will continue at least through 1943, so that the estimated cash on hand or available, as of December 31, 1943, after payment of State taxes but before payment of Federal income taxes for 1943, will be $18,715,808.[2] Deducting $4,135,603. to meet Federal income tax requirements for 1943, leaves $14,580,205, estimated net cash as of December 31, 1943, after payment of all taxes, both State and Federal, which estimate appears certain of fulfillment, as the conditions which have produced these earnings show no indication of early abatement, but will probably continue well into 1944.

This sum of $17,795,365. on hand October 1, 1943, is an existing fact, not a prophecy. It is in sharp contrast with the trustees' cash position of $1,301,857.37, as of December 31, 1940, which was the sum considered by the Commission when the present plan was formulated. The latter sum was barely sufficient to cover the company's requirements for working capital after paying reorganization expenses, to say nothing of capital fund requirements. When the present plan was formulated, this tremendous increase in liquid cash was not, and could not have been, foreseen by the Commission nor by the security holders.

This cash now in the hands of the reorganization trustees, or available to them, greatly exceeds the requirements of the reorganized company. It approximates 50% of the proposed new capitalization. Net cash available to the trustees on December 31, 1943, after payment of all taxes,

---

[1] 1943. Net Railway operating income: January through August actual $7,018,276; September through December estimated $1,986,664; total $9,004,940. Total income available for fixed charges, January through August actual $7,050,196;

September through December estimated $2,091,664; total $9,141,860.

[2] Cash $15,169,362; War bonds $3,000,000; special deposits $546,446; total $18,715,808.

will exceed the existing First Mortgage bonds by approximately $2,580,205. If the present plan were approved, this sum of fourteen and a half million dollars—to say nothing of future increases—would constitute a floating surplus, earning no income, which until otherwise disposed of would merely enhance the value of the new corporate stock.

This cash represents net earnings of the company, on which the bondholders have a lien. To the extent that it is prudently available, the bondholders are entitled to the benefit of this surplus cash, either by having it applied in an equitable manner in satisfaction of their claims, or by having it otherwise definitely allocated by the Commission as a component part of the reorganization plan, so that it may be equitably applied to the best advantage of all concerned. It is too great a sum to be left simply as a floating surplus, in a corporate disposition of which the minority security holders would have little voice. To approve the present plan, ignoring the existence of this fund, would be improvident and inequitable to all security holders, especially to the minority. Such a course would not afford due recognition to the rights of the present bondholders, who have liens on these funds.

If the post-reorganization corporate directors were disposed to use this fund to pay off $12,000,000 of the proposed new First Mortgage bonds, it would be necessary under the terms of that mortgage to pay a 5% "call" premium, aggregating $600,000. The existing $12,000,000 First Mortgage bonds could be retired as a part of this Section 77 reorganization, without penalty. If it is feasible to apply $12,000,000 of this cash surplus in discharge of the existing First Mortgage bonds, the capital structure of the new company could be desirably simplified, and its annual cash requirements substantially reduced. Payment of the existing First Mortgage bonds would render unnecessary a judicial determination of existing lien priorities, now in dispute, thus avoiding extended and costly litigation, which would further delay this reorganization. If the use of $12,000,000 to discharge the present First Mortgage bonds would leave insufficient funds available for working capital and for future capital expenditures after reorganization, a new first mortgage could be devised, in lieu of existing mortgages, under which two series of bonds could be issued, each sharing pari passu in the security of the mortgage, one series a fixed interest bond of not exceeding $6,000,000 aggregate principal to be used for capital expenditures, the other series an income bond in an appropriate aggregate principal sum, for distribution amongst present First & Refunding bondholders.

■ Changes in ownership of the First & Refunding bonds occurring since the Commission formulated the pending plan, render desirable, in the Court's opinion, a realignment of reorganization managers. The present plan provides one manager to be designated by the Institutional Group of First Mortgage bondholders, who hold about 45% of that issue; one to be designated by the Deposit Committee for First & Refunding 5% bonds, which Committee held about 35% of that issue when the present plan was formulated; and one manager to be designated by the Court. Florida National Building Corporation, representing the duPont interests, has acquired and now holds substantially more than 50% of the First & Refunding 5% bonds. As the Deposit Committee for First & Refunding 5% bonds now holds only about 3% of that issue, it waives the right to appoint a reorganization manager.

The Court feels that there should be no more than three managers in all, of whom one should be designated by the Court, primarily to represent minority and public interests. One should be designated by Florida National Building Corporation. The Court concurs in the designation of a manager by the Institutional Group of First Mortgage bondholders if its holdings continue substantially as at present. If the First Mortgage bonds are discharged by payment, the Institutional Group of course will have no further interest in the reorganization. In this event, the third manager could either be eliminated or allocated to some other interest. The activities of the reorganization managers should remain, as now, subject to the Court's approval.

■ As the effective date of the pending plan (January 1, 1942) has passed, a new effective date should be designated, allowing a reasonable interval within which to complete the pre-requisite statutory procedure.

The Court sustains (1) the objection that the existence of the unallocated cash surplus now on hand renders the pending plan inequitable; (2) the objection

of Florida National Building Corporation that its present security holdings entitle it to designate a reorganization manager; and (3) that a new effective date should be designated. Decision is reserved on all other questions.

On motion of the parties, the proceeding is referred back to the Interstate Commerce Commission in order to afford the Commission an opportunity to re-examine the entire situation in the light of the facts which have developed since the former hearings.

So ordered.