ST. JOE PAPER CO. ET AL. *v.* ATLANTIC COAST
LINE RAILROAD CO.

NO. 24.

Argued October 15, 1953.—Decided April 5, 1954.

*William D. Mitchell* argued the cause for petitioners.
With him on a brief for petitioners in No. 24 were *John*

*B. Marsh* and *Edward E. Watts, Jr.* Also on the brief were *Howard P. Macfarlane* and *George W. Ericksen* for Conn et al., *Henry P. Adair* and *Donald Russell* for the Trustees under the duPont Will, and *Giles J. Patterson* and *John R. Turney* for the St. Joe Paper Company, petitioners.

*Henry L. Walker* and *Sidney S. Alderman* filed a brief for the Southern Railway Company et al., and with them on the brief were *Harold J. Gallagher, Walter H. Brown, Jr.* and *James B. McDonough, Jr.* for the Seaboard Air Line Railroad Company, petitioners in No. 24.

*Clarence M. Mulholland* and *Edward J. Hickey, Jr.* filed a brief for the Railway Labor Executives' Association, petitioner in No. 24.

*Fred N. Oliver, Willard P. Scott* and *J. Turner Butler* filed a brief for petitioners in No. 33.

*Clifton S. Thomson* and *Chester Bedell* filed a brief for petitioners in No. 36.

*Miller Walton* filed a brief for petitioners in No. 37.

*Edward W. Bourne* argued the cause for respondent. With him on the brief were *Charles Cook Howell, Richard B. Gwathmey* and *Charles Cook Howell, Jr.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The sole question for decision in this case is whether the Interstate Commerce Commission has the power under § 77 of the Bankruptcy Act to submit a plan of reorganization to a district court whereby a debtor railroad would be compelled to merge with another railroad having no prior connection with the debtor. Answer to this problem depends on understanding of a long legislative history. First, however, it is necessary to put the problem into its relevant context.

In August of 1931, the Florida East Coast Railway was thrown into equity receivership. It operated in this manner until January of 1941, when a committee representing the owners of a substantial portion of the debtor's principal bond issue filed a petition for reorganization under § 77 of the Bankruptcy Act in the United States District Court for the Southern District of Florida. The petition was approved by the court, and, as provided in the statute, proceedings were initiated before the Interstate Commerce Commission for hearings on a plan of reorganization formulated by the bondholders' committee.

In the course of the next ten years, many proposals have been considered by the Commission. Most of them were rejected for one reason or another, but three have in turn been certified by it to the District Court. None has as yet been confirmed by that court. The initial plan provided for a simple internal reorganization. It was rejected by the court, and the case was remanded to the Commission with directions to take account of an intervening improvement in the debtor's cash position. 52 F. Supp. 420. Atlantic Coast Line Railroad, the present respondent, first appeared on the scene in November 1944 when, after the Commission's hearings for the purpose of devising a second plan had been closed, one Lynch, joined by other bondholders of the debtor, sought to reopen the proceedings for the purpose of proposing a new plan whereby each recipient of stock in the reorganized debtor would be required to sell 60% of his interest at par to Atlantic, a connecting carrier, thereby giving that railroad operating control of the debtor. On November 30, 1944, Atlantic was allowed to intervene before the Commission in support of the Lynch proposal. The St. Joe Paper Co., on the other hand, which had by that time acquired a majority interest in the debtor's principal bond issue, opposed the Lynch plan. The Commission re-

jected the Lynch proposal, indicating that, in view of Atlantic's operating deficits over the past years, combining the two railroads would not be in the public interest at that time. 261 I. C. C. 151, 187.

The subsequent struggle for control of the debtor has been largely between these two interests—the St. Joe Paper Co., owner of the major interest in the debtor, and Atlantic, a connecting carrier anxious to acquire the debtor's coveted Florida east coast traffic from Jacksonville to Miami. Shortly after the Commission's rejection of the Lynch plan, Atlantic proposed its own plan providing for the merger of the debtor into Atlantic in return for the distribution of cash and various types of Atlantic's securities to the debtor's bondholders. St. Joe again opposed, as did various other bondholders, two competitors of Atlantic, an association representing the debtor's employees, and other interested parties. The matter was referred to an Examiner who, after a lengthy investigation, found that such a merger would not be in the public interest, and that the Atlantic plan would not constitute "fair and equitable" treatment for all the unwilling bondholders who were in substance the owners of the debtor railroad.[1] The Commission, however, by a sharply divided decision overruled the Examiner and sanctioned

[1] Examiner Jewell stated that under the plan previously approved by the Commission "control would vest in the St. Joe Company by reason of its ownership of a majority in amount of the debtor's outstanding first and refunding mortgage bonds, these bonds being the only securities of the debtor exchangeable under the plan for the new securities of the reorganized debtor." R., VI, p. 736. The only other outstanding bond issue of the debtor was, under that plan, to be paid off out of available cash. Previously the Commission had decided that the claims of unsecured creditors and the equity of the stockholders could not be recognized, and that these parties would therefore be denied participation in the reorganization. 252 I. C. C. 423, 465.

a "forced merger."[2]  267 I. C. C. 295.[3]  Circuit Judge Sibley, sitting in the District Court, set the plan aside on the ground that the Commission had no power under the statute to force a merger; in addition, he held the plan not "fair and equitable." 81 F. Supp. 926. On appeal to the Court of Appeals for the Fifth Circuit, two judges sustained the Commission's authority to propose such a plan while the third agreed with Judge Sibley; but a majority agreed with the District Court that the plan was not "fair and equitable." 179 F. 2d 538.

The Commission then formulated another plan, which likewise provided for a forced merger of the debtor and Atlantic, 282 I. C. C. 81, and Circuit Judge Strum, sitting in the District Court, while bound on the question of the Commission's power by the prior Court of Appeals decision, again set the plan aside as unfair and inequitable. 103 F. Supp. 825. The Court of Appeals was now convened *en banc*. Three of its judges, without further consideration of the Commission's power, reversed the District Court and found the plan fair and equitable. The other two judges dissented and adopted the reasoning of Judge Sibley in the earlier case, *i. e.*, that the Commission had no power under the statute to propose such a compelled merger plan.[4]  201 F. 2d 325.

[2] By "forced merger" plan, or "compulsory merger" plan, is meant a merger plan foisted upon one of the parties by the Commission, as distinguished from a merger voluntarily initiated by the participating carriers.

[3] Under the Commission's statutory power to revise an approved plan upon objections received within sixty days of its promulgation, 11 U. S. C. § 205 (d), this decision was shortly thereafter reaffirmed by another close vote of the full Commission membership. 267 I. C. C. 729.

[4] The Circuit Judges of the Fifth Circuit who have at some stage in these proceedings passed on this question of the Commission's power have thus divided evenly on the issue. Judges Hutcheson, Holmes and Rives concluded that the Commission had such power; Judges Sibley, Borah, and Russell concluded that it did not.

Because of the importance of this question in the administration of § 77 of the Bankruptcy Act, we granted certiorari. 345 U. S. 948.

The procedure by which the Commission is authorized to consider and approve a plan of reorganization and then submit it to the interested parties for acceptance, as well as the courts for judicial confirmation, is governed by an elaborate statutory scheme. See § 77 of the Bankruptcy Act, 47 Stat. 1474, as amended, 11 U. S. C. § 205. Any question such as the one now here must be resolved by reference to this governing law and its underlying purpose, imbedded as that is not merely in the formal words of the statute but in the history which gives them meaning. If ever a long course of legislation is to be treated as an organic whole, whose parts are not *disjecta membra,* this is true of § 77.

The respondent relies on subsection (b)(5) to sustain the Commission's power to submit a forced merger plan of the type here involved.[5] This was subsection (b)(3) of the original § 77 of the Bankruptcy Act as enacted in 1933, 47 Stat. 1474, 1475. It then read, insofar as here material,

> "(b) A plan of reorganization within the meaning of this section . . . (3) shall provide adequate means for the execution of the plan, which may, so far as may be consistent with the provisions of sections 1 and 5 of the Interstate Commerce Act as amended, include . . . the merger of the debtor with any other railroad corporation . . . ."

The permissive merger provision in plans of reorganization was thus made expressly conditional on compliance with the requirements of §§ 1 and 5 of the Interstate

---

[5] "A plan of reorganization . . . (5) shall provide adequate means for the execution of the plan, which may include . . . the merger or consolidation of the debtor with another corporation or corporations . . . ."

304

Commerce Act. The reason for this proviso, commonly referred to as the "consistency clause," was stated as follows by Commissioner Joseph Eastman, Chairman of the Legislative Committee of the Interstate Commerce Commission and one of the weightiest voices before Congress on railroad matters: [6]

> "*Explanation.*—This act ought not to authorize railroad mergers . . . which are inconsistent with the applicable provisions of the Interstate Commerce Act, particularly the consolidation-plan provisions. These amendments are intended to avoid that possibility."

In the ensuing floor debates it was further made clear that the purpose of the consistency clause was to subject mergers under § 77 to whatever restrictions obtained for mergers under the Interstate Commerce Act. Representative Hatton Sumners, Chairman of the Judiciary Committee which had reported out the bill and floor manager of the bill, gave this assurance:

> "Mr. HORR. May I inquire whether or not, where the word 'reorganization' is used, the gentleman is of the opinion that this would encourage consolidations of railroads?
>
> "Mr. SUMNERS of Texas. They could not be consolidated in violation of the interstate commerce act.
>
> "Mr. HORR. They would first have to go through that?
>
> "Mr. SUMNERS of Texas. They would first have to go through that." 76 Cong. Rec. 2909.

---

[6] Letter from Chairman Eastman to Senator Hastings, the sponsor of § 77, dated Jan. 31, 1933, reproduced in Hearings before the Senate Committee on Interstate Commerce on S. 1869, 76th Cong., 1st Sess. 288, 300. As to Eastman's authority in the field of railroad regulation, see Fuess, Joseph B. Eastman—Servant of the People.

And Congressman Rayburn, Chairman of the Committee on Interstate and Foreign Commerce, put it thus:

> "Fear has been expressed that with the enactment of this bill the powers of the Interstate Commerce Commission and the courts over consolidations and mergers would be expanded. It is my firm conviction that this proposal in specific provisions safeguards the present consolidation and merger provisions of the interstate commerce act and gives no additional authority to the commission or the courts in these matters." 76 Cong. Rec. 2917–2918.

In view of this deliberate and explicit incorporation of the restrictions attending mergers under the Interstate Commerce Act into § 77 of the Bankruptcy Act, it is necessary to give some consideration to the merger and consolidation provisions of the former, 49 U. S. C. § 5. The history of these provisions is long and tortuous; its detailed summary is relegated to an appendix, *post,* p. 315. Suffice it to say here that one clear thread which runs through a course of legislation extending over a period of twenty years, as well as through the various commentaries upon it, is that only mergers voluntarily initiated by the participating carriers are encompassed by that statute and sanctioned by it. From the initial enactment in the Transportation Act of 1920, 41 Stat. 456, 480, to the most recent comprehensive re-examination of these provisions in the Transportation Act of 1940, 54 Stat. 898, 905, Congress has consistently and insistently denied the Interstate Commerce Commission the power to take the initiative in getting one railroad to turn over its properties to another railroad in return for assorted securities of the latter. The rôle of the Commission in this regard has traditionally been confined to approving or disapproving mergers proposed by the railroads to be merged. And this adamant position taken by Congress has not

been for want of attempts to secure relaxation. Advocacy of giving the Commission power to propose and enforce mergers has been steady and, at times, strong, but it has consistently failed in Congress.

The reasons for this hostility to mergers imposed by the Commission derive largely from the disadvantages attributed by Congress to such far-reaching corporate revampings. Employees of the constituent railroads would, it has been feared, almost certainly be adversely affected. Shippers and communities adequately served by railroad A may suddenly find themselves unfavorably dependent upon railroad B. Investors in one railroad would, contrary to their expectations, find their holdings transmuted into securities of a different railroad. As the Commission in its 1938 Annual Report said of consolidations:

> "Projects of this character cannot be crammed down the throats of those who must carry them out or conform to them. Legal compulsion can be used with advantage to bring recalcitrants and stragglers into line, but not to drive hostile majorities into action." (P. 23.)[7]

We therefore conclude that the Commission does not have under § 77 of the Bankruptcy Act a power which Congress has repeatedly denied it under the Interstate Commerce Act, namely to initiate the merger or consolidation of two railroads. In light of the continuously and vehemently reiterated policy against endowing the ICC with such a power under § 5 of the Interstate Commerce Act, it is inconceivable, wholly apart from the consistency clause, that such was the *sub silentio* effect of § 77, an emergency statute hurriedly enacted with scarcely any debate. The consistency clause serves but to strengthen

---

[7] See also the remarks of Senator Couzens, Chairman of the Committee on Interstate Commerce, at 74 Cong. Rec. 6041 *et seq.*

this natural presumption against such a tacit grant. It would require unambiguous language indeed to accomplish a contrary result; yet nowhere in the committee reports and the debates on the original § 77, nor in any of the legislative materials relating to the thorough re-examination of that statute in 1935,[8] can we find so much as one word which conveys the impression that as to mergers under the Bankruptcy Act, Congress stealth-

---

[8] In the course of the 1935 revision of § 77, the consistency clause was taken out of subsection (b)(3), combined with a similar clause in subsection (e), and, as thus combined, placed in subsection (f) of the statute, 49 Stat. 911, 920. Judge Sibley indicated that he thought the consistency clause "became accidentally misplaced in redrafting the Act." 81 F. Supp., at 932. However that may be, it seems quite clear that Congress did not intend to alter the deliberately established relationship between § 5 of the Commerce Act and § 77 (b)(3) of the Bankruptcy Act merely by a change in the position of the consistency clause, unaccompanied by any explanatory comment. It would be a gross disregard of the meaning of legislation to be controlled by the bare words of the present merger provision detached from, and in defiance of, the whole history of the section.

In this connection it is interesting to note that in the course of a proposed comprehensive revision of § 77 in 1939, the question here in issue would have been made absolutely clear by the addition of the following proviso to the merger subsection:

> "*Provided,* That nothing in this section shall authorize compulsory merger or consolidation . . . ." S. 1869, 76th Cong., 1st Sess., March 20, 1939, p. 19.

After extensive hearings before the Senate Committee on Interstate Commerce, the bill was reported out and subsequently passed by the Senate, 84 Cong. Rec. 6257. Even more extensive hearings were then held by the House Committee, but the bill was never reported out, probably because of the controversial provision in the bill establishing a special reorganization court for § 77 cases.

In the course of the House hearings, the Commission was requested to submit its views on the bill. After commenting in detail on various sections of the bill, not including the proviso above referred to, the Commission simply added that it deemed it "unnecessary" to comment on the other "minor amendments" included in

ily designed to jettison its long-standing and oft-reiterated policy against compulsory mergers. On the contrary, after the enactment of § 77 in 1933, the Commission in its annual reports, and the Federal Coordinator of Transportation in his several reports, had frequent occasion to discuss § 77 of the Bankruptcy Act and § 5 of the Interstate Commerce Act. It would indeed be strange for these railroad authorities to bemoan the Commission's inability to initiate mergers and consolidations [9] if it had been a fact that as to the substantial portion of the Nation's railroad mileage then in receivership or § 77 proceedings [10] the Commission clearly had this very power. Had it been the declared intention of the drafters of § 77 to confer such a power, it is fair to assume that, in view of the persistent opposition of organized labor and other groups

---

the bill. Hearings before Special Subcommittee on Bankruptcy and Reorganization of the House Committee on the Judiciary on S. 1869, 76th Cong., 1st Sess., Serial No. 11, pt. 1, p. 571.

Cassius M. Clay, Assistant General Counsel of the RFC and intimately acquainted with problems of railroad reorganization, questioned the need for the proviso on the ground that the consistency clause in subsection (f) already covered the matter and that the proviso might be construed to prevent the merger of a parent and its subsidiaries. Hearings before Senate Committee on Interstate Commerce on S. 1869, 76th Cong., 1st Sess. 329.

[9] See, e. g., Report of the Federal Coordinator of Transportation, H. R. Doc. No. 89, 74th Cong., 1st Sess. 41 (1935); 52 I. C. C. Ann. Rep. 22 (1938).

[10] During the years 1933–1940 the percentage of railroad mileage representing roads in § 77 proceedings or receivership was as follows:

| Year | Percent | Year | Percent |
|------|---------|------|---------|
| 1933 | 16 | 1937 | 28 |
| 1934 | 16 | 1938 | 31 |
| 1935 | 27 | 1939 | 31 |
| 1936 | 28 | 1940 | 31 |

(Figures computed from Table 1 of the ICC's Annual Reports on the Statistics of Railways in the United States for 1933–1940, and the cumulative Table 151 in the 1940 volume.)

to such attempts under the Commerce Act,[11] the statute would not have passed.

All this of course is not to say that mergers cannot be carried out in the course of a § 77 reorganization. It merely means that if they are, they must be consummated in accordance with all the requirements and restrictions applicable to mergers under the Act primarily concerned with railroad amalgamations, the Interstate Commerce Act. So far as here relevant, that means that the merger must be worked out and put before the Commission by the merging carriers.[12] It also means that one carrier

---

[11] See Appendix, *post*, p. 315.

[12] We are not aware of any case other than the present where this requirement was not observed. In all the reported cases of reorganizations involving mergers, the merger was either proposed by the debtor in conjunction with the other party, or the merger involved a parent and its subsidiaries, and was treated essentially as an internal reorganization. In any event, we are not now called upon to pass on the validity of the latter type of merger.

In this connection it is important to remember that a railroad in § 77 proceedings is not a defunct organism but remains a live and going concern. See the references throughout § 77 to "the debtor" as an active entity; also *Van Schaick* v. *McCarthy*, 116 F. 2d 987, 992–993. During the entire period that the Florida East Coast has been in receivership or trusteeship there have been annual stockholders' meetings at which a Board of Directors was elected. See the Florida East Coast's Annual Reports on file with the Interstate Commerce Commission. Indeed the desire to provide a ready remedy for the overhauling of a railroad's financial structure without impairing its primary responsibilities as a regularly functioning carrier was one of the principal reasons for the enactment of § 77. See 5 Collier, Bankruptcy, § 77.02. Thus it follows from the consistency clause, when viewed in the light of this corporate continuity of a railroad in reorganization, that those who in the absence of § 77 would wield the corporate merger powers must initiate and work out the merger now. Cf. § 77 (d), which not only permits but requires the debtor railroad itself to file a plan of reorganization ("the debtor . . . shall file a plan"; certain other interested parties "may" also file a plan).

cannot be railroaded by the Commission into an undesired merger with another carrier.

In short, the consistency clause of § 77 incorporates by reference § 5 of the Interstate Commerce Act, as amended. And the very heart of § 5 is that a merger of two carriers may be approved by the Interstate Commerce Commission only if it originates as a voluntary proposal by the merging carriers. This essential prerequisite for a merger between Florida East Coast and Atlantic Coast Line—two existing corporate entities—must be complied with, for by virtue of the consistency clause the command of Congress applies even if one of these carriers is in § 77 proceedings just as much as it would if neither of the carriers were in receivership or trusteeship. The legislative incorporation of § 5 into § 77 should not result in its judicial mutilation.

The most recent occasion on which the Senate Committee on Interstate Commerce comprehensively re-examined the subject of railroad reorganization was the report submitted in 1946 by Chairman Wheeler, the guiding spirit of most of the legislation here under consideration.[13] Much of what the Committee says there under the heading of "Avoidance of consolidation statute" is highly relevant here:

> "In view of [the] many interests, immediately and directly affected by any proposed consolidation, Congress has provided a series of safeguards and procedural steps, in section 5 of the Interstate Commerce Act. . . .

> .     .     .     .     .

> "This statute and its statutory procedure, statutory safeguards, and statutory rights have been set to one side in the proceedings under section 77 of

---

[13] S. Rep. No. 1170, 79th Cong., 2d Sess. 80–85.

the Bankruptcy Act. The institutional and other groups, and the Commission, have assumed that they could effect consolidations, not under the Interstate Commerce Act, but under the Bankruptcy Act; not under a statute dealing with transportation, but under a statute dealing with financial reorganization; not under a section which considers and specifies one single financial question, the effect of consolidation on fixed charges, but under a section which deals with all sorts of financial problems, most of them not related to consolidation. They have assumed to effect consolidations, not under legislation which deals primarily with the rights and interests of States, local communities, and employees, but under a bankruptcy law which deals primarily with the interests of securityholders.

"Those who are trying to bypass this statute and to consolidate railroads as part of a financial reorganization proceeding bring consolidation into the proceeding as something subsidiary, a mere tail to the main kite. When governors of States and representatives of communities and employees organizations are invited to the proceedings by the Commission, they find the issue which primarily concerns them enveloped in all sorts of other questions of a financial and technical nature. If they should want to appeal to a court from a consolidation decision in this grab bag of proceedings, their task would be far more complicated and far more difficult than Congress intended when it passed section 5 of the Interstate Commerce Act. There is always the available cry—the courts should not disapprove any part of the reorganization plan, even though it be a consolidation matter, lest all the time and labor and expense

which has gone into the reorganization proceeding be lost.

.    .    . .    .    .

"The Commission justifies its course of action by citing two subsections of section 77 of the Bankruptcy Act. Subsection (b) lists a number of the substantive changes which can be made through a plan of reorganization under section 77. Then it lists a number of 'means for the execution of the plan,' . . . . Among these 'means for the execution of the plan' is included 'the merger or consolidation of the debtor with another corporation or corporations.' Subsection (f) authorizes the Commission, after the court confirms the plan, 'without further proceedings' to authorize the issuance of securities, transfer of property, sale, 'consolidation or merger of the debtor's property, or pooling of traffic, to the extent contemplated by the plan and not inconsistent with the provisions and purposes of the Interstate Commerce Act as now or hereafter amended.'

"Note should be taken of the Commission's position. It could, under its construction of the statute, authorize not only mergers, but also pooling of traffic, without complying with the requirements laid down by Congress in section 5 of the Interstate Commerce Act. Consolidations, mergers, and pooling of traffic have long been regarded as dangerous, if not carefully regulated and supervised; Congress has long had those evils in mind and sought to prevent excesses, while saving what is good in such transactions; to this end Congress carefully elaborated a considerable number of safeguards in section 5 of that act. None of those safeguards is elaborated in section 77 of the Bankruptcy Act.

"It may not be assumed that Congress intended, in section 77, to permit it to bypass the section 5

procedure and proceedings. Section 77 was hurriedly passed by Congress. It was not considered by either a subcommittee or full committee of the Senate, before being taken up on the floor. It was pushed through in the final days of the Seventy-second Congress on the plea that it would prevent receiverships. Congress would not, in such a manner, legislate out of existence, for companies requiring reorganizations, its carefully elaborated safeguards with respect to consolidations or traffic pools. If the Commission's construction of section 77 is sound, that it can avoid the necessity of considering consolidations under section 5 of the Interstate Commerce Act, it is obvious that the legislation enacted as section 77 of the Bankruptcy Act contained a 'joker' of serious and dangerous proportions.

.         .         .         .         .

*"The most that the Commission may claim under section 77 is that, if it has approved a consolidation by an order under section 5 of the Transportation Act, it may perhaps be able to give effect to that action in the course of reorganization proceedings.*

"This is of importance in administering both statutes. The procedure and safeguards of the Transportation Act must be preserved as a matter of law and of right; . . . ." (Emphasis added.)

The crucial question, therefore, is whether this merger plan meets the statutory requirements. Since it does not, as we have found, because it is sought to be imposed by Commission fiat rather than proposed by the merging carriers, it matters not that the security holders might ultimately accept it if it were put to them for a formal vote. The kind of Hobson's choice, more or less, to which security holders are put when voting on a merger plan is not to be put to them on a plan initiated by the Commission

rather than by their own corporation. And so, if a plan does not satisfy the basic conditions which circumscribe the Commission's power, it has a congenital defect, and any interested party can object to its attempted effectuation.

Likewise, the so-called "cramdown" clause, much relied on by respondent, has no bearing on this case. That provision was added to § 77 of the Bankruptcy Act in 1935, 49 Stat. 911, 919, 11 U. S. C. § 205 (e), because under the prior law a plan had to be accepted by at least two-thirds (in amount) of each class of creditors and stockholders affected by the plan. This enabled a small dissentient minority to block any plan of reorganization, no matter how "fair and equitable," in order to exact inequitable adjustments as the price of its acquiescence. Under the "cramdown" provision the district court may, under the appropriate circumstances and after making certain required findings, confirm a plan despite the disapproval of more than one-third of each class affected. From the existence of this general power in the *district court* to *confirm* a plan despite the opposition of dissentient elements, the conclusion is sought to be drawn that the *Commission* must therefore have initial power to *submit* a compulsory merger plan to the court. Obviously this does not follow. Since the vast majority of § 77 proceedings involve internal reorganizations, the "cramdown" provision has a purpose and scope of application wholly independent of mergers, and it therefore has no bearing one way or the other on the question at issue in this case.[14] It is true that in view of our holding here that merger plans cannot be proposed by the Commission under the Bankruptcy Act, the "cramdown" provision can never be applied to such involuntary plans. But there

---

[14] There is nothing in the legislative history of this provision to indicate that it was intended to have any effect on the law governing mergers in reorganization plans.

is nothing particularly startling about this. Once its terms are found to be valid, a plan may be imposed on recalcitrant dissenters. But the validity of a plan cannot be derived from the existence of such "cramdown" power. It is still true that a horse-chestnut is not a chestnut horse.

The judgment is reversed and the case is remanded to the District Court for further proceedings in accordance with this opinion.

*Reversed and remanded.*

MR. JUSTICE BLACK and MR. JUSTICE CLARK took no part in the consideration or decision of these cases.

[For dissenting opinion, see *post*, p. 321.]

## APPENDIX TO OPINION OF THE COURT.

*A brief outline of the history of the consolidation provisions of the Interstate Commerce Act.*

Prior to 1920, competition was the *desideratum* of our railroad economy. Section 5 of the original Interstate Commerce Act of 1887 forbade any agreements for the pooling of freights or revenues,[1] and the policy of the antitrust legislation was also applied to the railroads.[2]

In 1919, when the Government was planning to return the railroads to private ownership, many of the smaller railroads were in very weak condition and their continued survival was in jeopardy.[3] Hence, for the first time, governmental encouragement of railroad consolidation was discussed. It was agreed that the Interstate Commerce Commission should be directed to prepare a plan for the

---

[1] 24 Stat. 379, 380.

[2] 26 Stat. 209, *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290; *United States* v. *Joint Traffic Assn.*, 171 U. S. 505; 38 Stat. 730.

[3] See S. Rep. No. 1182, pt. 2, 76th Cong., 3d Sess. 518–520; also Van Metre, Transportation in the United States, 80.

consolidation of the railroads of the country into a lim-
ited number of systems.   But there was sharp disagree-
ment over ways and means for carrying out this program.
The House Committee opposed grant of power to the
Commission to compel consolidations.[4]   The Senate Com-
mittee, however, under the leadership of Senator Cum-
mins, an ardent advocate of compulsory consolidation,
recommended a bill providing for voluntary consolidation
in accordance with a master plan for a period of seven
years, but authorizing compulsory consolidations there-
after.[5]   Although many groups, including virtually all
the railroads, opposed the compulsory provisions,[6] the
Senate passed the bill, 59 Cong. Rec. 952.   But in con-
ference, "[t]he Senate receded from the provisions for
compulsory consolidation" and the House version was
adopted.[7]

In 1921, the Commission promulgated a tentative con-
solidation plan.[8]   Strong opposition immediately devel-
oped and long hearings before the Commission ensued.

---

[4] H. R. Rep. No. 456, 66th Cong., 1st Sess. 6: "In our opinion, the
interests of the public will be better served where the consolidations
are voluntarily entered into, upon approval by the Interstate Com-
merce Commission, and where such consolidation or merger is in
the interest of better service to the public, or economy in operation,
or otherwise of advantage to the convenience or commerce of the
people."

[5] S. Rep. No. 304, 66th Cong., 1st Sess. 15.

[6] See statement of Senator Cummins at 59 Cong. Rec. 226; see
also Leonard, Railroad Consolidation Under the Transportation Act
of 1920, 50, 61.

[7] H. R. Rep. No. 650, 66th Cong., 2d Sess. 64; see also S. Rep.
No. 1182, pt. 2, 76th Cong., 3d Sess. 524: "It will be noted that the
whole program of consolidation . . . was voluntary.   Although the
Commission could promulgate a plan, it was given no affirmative
power to put the plan into effect.   It was entitled merely to insist that
any consolidations submitted to it for approval should conform to the
plan.   Thus the whole problem of initiating and developing actual
consolidations was left in the hands of the carriers themselves. . . ."

[8] 63 I. C. C. 455.

The upshot was that in 1925, the Commission, recognizing the unfeasibility of working out a national plan of consolidation, asked Congress to be relieved of this burden.[9] This request was left unheeded until 1940, and in 1929 the Commission adopted its final plan of consolidation.[10]

Meanwhile Senator Cummins renewed his efforts to give the Interstate Commerce Commission power to compel consolidations if after a certain number of years the voluntary program had made no progress.[11] This bill again met with strong opposition,[12] but prior to his defeat in 1926, Senator Cummins made two further attempts to endow the Commission with power to force consolidations.[13] All these legislative efforts failed.

In February of 1933, the drive for compulsory consolidation gained new impetus when the National Transportation Committee, headed by ex-President Coolidge, issued a report recommending legislation along these lines.[14] Again the opposition was so vigorous[15] that the Emergency Railroad Transportation Act of 1933, passed some months later, contained no such provision; on the contrary it had a special section designed to protect labor against further cutbacks in employment.[16]

The 1933 Act also established the office of a Federal Coordinator of Transportation to investigate the entire transportation problem and make appropriate recommendations. In his first Report, the Coordinator, Commis-

---

[9] For the Commission's letter to the Chairman of the Committee on Interstate Commerce, see Exhibit C–1814, S. Rep. No. 1182, pt. 3, 76th Cong., 3d Sess. 1578; see also 39 I. C. C. Ann. Rep. 13 (1925).

[10] 159 I. C. C. 522.

[11] S. 2224, 68th Cong., 1st Sess.

[12] See Leonard, *supra,* note 6, at 135, 175–179.

[13] S. 1870, 69th Cong., 1st Sess.; S. 3840, 69th Cong., 1st Sess.

[14] Report of the National Transportation Committee, February 13, 1933, p. 11.

[15] See, *e. g.,* 77 Cong. Rec. 4873 *et seq.;* Leonard, Railroad Consolidation under the Transportation Act of 1920, 221–222.

[16] 48 Stat. 211, 214.

sioner Joseph Eastman, reviewed the subject of railroad consolidations and concluded that the sweeping proposal of his legal adviser, Mr. Leslie Craven, for compulsory consolidation should not be followed, but that the remedy lay along lines of greater coordination and pooling, with some forced mergers on a "trial" basis.[17] The third and fourth Reports reiterated the Commission's inability to compel mergers.[18] Again no legislative action resulted.[19]

In 1938, President Roosevelt appointed Commissioners Eastman, Splawn, and Mahaffie of the Interstate Commerce Commission to make another comprehensive study of the railroad problem. This "Committee of Three," after pointing out that "voluntary consolidation of railroad companies may now be accomplished, subject to certain limitations, with the approval of the Commission," recommended new legislation, giving the Commission "authority . . . to require a unification, where it is sought by at least one carrier." [20] Subsequently the President also appointed another Committee consisting of three railroad executives and three representatives of railway labor, known as the "Committee of Six." This Committee's recommendations were vastly different: [21]

"We do not think the country is ready for any compulsory system of consolidations. Whether ulti-

[17] S. Doc. No. 119, 73d Cong., 2d Sess. 30–33, 36–37, 86–88.

[18] H. R. Doc. No. 89, 74th Cong., 1st Sess. 41; H. R. Doc. No. 394, 74th Cong., 2d Sess. 45–47.

[19] Shortly before the termination of his office in 1936, the Federal Coordinator, disturbed by the lack of initiative among the carriers, attempted to order the unification of 11 terminal properties. The orders met with considerable objection from railway labor and were ignored by the carriers. See Leonard, *supra*, note 15, at 233.

[20] H. R. Doc. No. 583, 75th Cong., 3d Sess. 36, 39. For the adverse reaction of the Railroad Brotherhoods to these proposals, see *id.*, at 67, 70.

[21] Report of Committee appointed Sept. 20, 1938, by the President of the United States to Submit Recommendations upon the General Transportation Situation, Dec. 23, 1938, p. 31.

mate resort must be had to the principle of compulsion is a question which we think it better to defer until after there has been an opportunity to see what can be accomplished if the railroads are relieved from these limitations and restrictions [of the consolidation plan]. In our opinion the best results will be achieved by leaving all initiative in the matter to the railroads themselves, . . . ."

The Transportation Act of 1940—Congress' last word on the subject of consolidation—essentially rejected the recommendations of the Committee of Three and adopted those of the Committee of Six. The Commission was finally relieved of its duty to promulgate a national consolidation plan, and the power to initiate mergers and consolidations was left completely in the hands of the carriers.[22]

Perhaps the best insight into the prevailing attitude towards compulsory mergers can be obtained from the following statements of Chairman Wheeler of the Senate Committee on Interstate Commerce during the hearings on S. 2009, which ultimately became the Transportation Act of 1940. In response to some fear expressed by the General Counsel of the Brotherhood of Railroad Trainmen that the pending bill would encourage consolidations, Senator Wheeler said: [23]

"Of course, as you well know, some people maintain that we ought to give the Interstate Commerce Commission the power to force consolidations.

"There is a very strong sentiment on the part of a great many people that consolidation should be compelled. They say that nothing will be done until such time as that happens.

---

[22] 54 Stat. 898, 905.

[23] Hearings before the Senate Committee on Interstate Commerce on S. 1310, S. 2016, S. 1869 and S. 2009, 76th Cong., 1st Sess. 391–395.

"The railroad executives do not want forced consolidation; they are opposed to it. The railroad men are opposed to it, generally speaking.

. . . . .

"After all, when you speak of that [encouraging consolidations], the Interstate Commerce Commission has studied it for years, and no consolidation can take place under this bill until such time as it is a voluntary consolidation. . . .

. . . . .

"I cannot understand why you are talking about consolidations before this committee, because there is nothing in this bill to indicate that we have taken the position that we are in favor of forced consolidations. There is nothing in the bill that will change the situation at all.

. . . . .

"As a matter of fact, much of the objection to this bill on the part of a number of people has been that it has not got some provision in it making it easier for consolidations; as a matter of fact, forcing consolidations and coordinations, or at least setting up in the Interstate Commerce Commission a committee that will go ahead and suggest how consolidations ought to be made.

"We have taken that out, and I have refused to adhere to that or to listen to agruments [sic] about it, but you are coming in here and telling us that there is something in here about consolidations that you do not want.

. . . . .

"I have repeatedly said that you could not get a bill to force consolidations, or to have in here a provision that the Commission should have an opportunity of carrying on investigations of the subject to

try to force consolidations, and so forth. So, as far as this committee is concerned, with reference to this bill, you are just wasting our time in talking about consolidations, because that subject is out the window."

Thus, hostility to the consolidation of railroads except by the voluntary action of the merging roads has been the undeviating policy of Congress since 1920. In assessing the failure of the consolidation program initiated by the Transportation Act of 1920, most students of transportation problems agree that one difficulty was this persistent refusal on the part of Congress to give the Commission power to take the initiative in proposing and enforcing particular mergers.[24] Yet that is the policy deliberately and explicitly followed by Congress each time it considered this problem.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BURTON and MR. JUSTICE MINTON concur, dissenting.

The Court misstates the issue in these cases. The sole question, the Court says, is whether the Interstate Commerce Commission has the statutory power to submit a plan of reorganization under § 77 of the Bankruptcy Act "whereby a debtor railroad would be compelled to merge with another railroad." That is not the issue. Neither the Interstate Commerce Commission nor the reorganization court has attempted to force a merger of these railroads. If at some future time any such attempt is made, it will be time enough to deal with it. Hence it is misleading for the Court to say that the issue is whether a merger may be "foisted upon one of the parties by the

---

[24] Leonard, Railroad Consolidation Under the Transportation Act of 1920, 267–269; Van Metre, Transportation in the United States, 86; Moulton, The American Transportation Problem, 857–858; Dearing and Owen, National Transportation Policy, 322, 342–343, 376.

Commission." The one and only issue before us at the present time is whether the Commission may include in a plan of reorganization a provision that the debtor or bankrupt railroad should be merged with another road and submit that plan for approval or disapproval to the security holders who are entitled to vote on a plan. To understand the issue in these cases it is necessary to have an understanding of the respective functions of the Commission and the reorganization court under § 77.

*First.* Under § 77 the Commission is the chief architect of any plan of reorganization. The plan must originate with the Commission. § 77 (d). *Second.* Once a plan is certified by the Commission it goes to the Court for a hearing. § 77 (e). *Third.* After that hearing the judge either approves or disapproves the plan. § 77 (e). *Fourth.* If the judge disapproves the plan, he either dismisses the proceedings or refers the matter back to the Commission. § 77 (e). *Fifth.* If the judge approves the plan, he sends a certified copy of his opinion and order to the Commission. § 77 (e). *Sixth.* In that case the Commission submits the plan to the security holders for a vote. § 77 (e). *Seventh.* The Commission certifies the results of the submission to the court. § 77 (e). *Eighth.* The judge then confirms the plan, if the creditors and stockholders of each class entitled to vote and holding "more than two-thirds" of the claims in each class have accepted the plan. § 77 (e). *Ninth.* If that percentage of creditors and stockholders does not approve the plan, the judge, by terms of § 77 (e), may nevertheless approve the plan. This is the so-called "cram down" provision and it reads as follows:

> "if the plan has not been so accepted by the creditors and stockholders, the judge may nevertheless confirm the plan if he is satisfied and finds, after hearing, that it makes adequate provision for fair and equi-

table treatment for the interests or claims of those rejecting it; that such rejection is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts; and that the plan conforms to the requirements of clauses (1) to (3), inclusive, of the first paragraph of this subsection (e)." [1]

The case has been discussed as if we are at the *Ninth* stage of the reorganization. Rather, only the *Fifth* stage has been completed and the *Sixth* stage is about to start.

The case has been discussed as if the creditors will vote the plan down and the judge, in the face of that, will force the plan on the creditors through the "cram down" provision.

But as yet no vote has been taken. Perhaps the powerful interests represented by the petitioners will vote solidly and overwhelmingly against the plan. Perhaps not. Election campaigns sometimes change votes. Perhaps the creditors will eventually approve the plan.

Our present problem must be weighed in light of both of those contingencies.

If the creditors approve the plan by "more than two-thirds" vote but less than 100 percent, would it be lawful

---

[1] Clauses (1) and (2) referred to read as follows:

"the judge shall approve the plan if satisfied that: (1) It complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; (2) the approximate amounts to be paid by the debtor, or by any corporation or corporations acquiring the debtor's assets, for expenses and fees incident to the reorganization, have been fully disclosed so far as they can be ascertained at the date of such hearing, are reasonable, are within such maximum limits as are fixed by the Commission, and are within such maximum limits to be subject to the approval of the judge; . . . ."

to confirm it? I think it plainly would be for the following reasons:

Section 77 contemplates the use of reorganizations to consummate mergers. Section 77 (b)(5) says that a plan "may include the transfer of any interest in or control of all or any part of the property of the debtor to another corporation or corporations, *the merger or consolidation of the debtor* with another corporation or corporations," etc. (Italics supplied.) So it is clear that Congress contemplated that mergers of railroads could be effected by a § 77 plan of reorganization.[2] Since mergers could be accomplished that way, Congress felt—as the legislative history abundantly shows—that the Commission must apply in this class of mergers the same standards it must apply in other mergers. Accordingly Congress wrote into § 77 (f) the "consistency clause"—that on confirmation of a plan the Commission shall grant authority for the "transfer of any property, sale, consolidation or merger of the debtor's property . . . to the extent contemplated by the plan and *not inconsistent with the provisions and purposes*" of the Interstate Com-

---

[2] The Commission has repeatedly proposed and approved reorganization plans requiring consolidations or mergers. See, *e. g., Alton R. Co. Reorganization,* 261 I. C. C. 343; *New York, N. H. & H. R. Co. Reorganization,* 254 I. C. C. 63, 405; *Missouri Pac. R. Co. Reorganization,* 239 I. C. C. 7; *Denver & R. G. W. R. Co. Reorganization,* 233 I. C. C. 515, 239 I. C. C. 583, 254 I. C. C. 349. As a result of some of these proceedings the Commission has been criticized for misapplying or disregarding the standards set up for mergers by § 5 of the Interstate Commerce Act. S. Rep. No. 1170, 79th Cong., 2d Sess. 80–85. In the present case, however, no argument is made that the proper standards have not been applied. Indeed that question is not before us. Moreover, not even the Senate Report, *supra,* suggests that the Commission cannot ever approve reorganization mergers. That Report says only that the "procedure and safeguards of the Transportation Act must be preserved . . . ." And, as we shall see, the standards prescribed in § 5 have been satisfied here, so far as this record reveals.

merce Act. (Italics supplied.) Section 5 of the Interstate Commerce Act prescribes both a *procedure* for the Commission to follow in those cases and the *standards* which the Commission must apply.

The *procedure* includes among other things (a) notification to the Governors of each State in which the properties of the carriers are situated; and (b) a reasonable opportunity for the "interested parties" to be heard. No objection is made in these cases (and no showing is attempted) that that procedure was not followed.

The *standards* for the Commission's action on mergers are different from those prescribed in case of reorganizations. In reorganizations the Commission is concerned with matters of valuation, the amount of fixed charges, the ratio of bonds to stock, and like financial problems. See *Ecker* v. *Western Pacific R. Corp.*, 318 U. S. 448. Congress by § 5 of the Interstate Commerce Act has prescribed special *standards* for mergers. Section 5 (2)(c) states:

> "In passing upon any proposed transaction under the provisions of this paragraph (2), the Commission shall give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected."

There is no objection made nor showing attempted that in these cases the Commission failed to make findings on those issues nor that the findings as made were inadequate. The Commission indeed was most explicit. It said that control of Florida East Coast by the petitioner in No. 24, St. Joe Paper Co., would be "contrary to the

public interest" since that company, "particularly because of its large banking interests," would be in a position to influence the routing of shipments. 282 I. C. C., p. 187. It found that the merger of the Florida East Coast with Atlantic Coast Line

—would be in the public interest.[3] *Id.*, pp. 187, 188.

—would adequately protect the interests of employees.[4] *Id.*, p. 187.

—would result in savings as a result of unification.[5] *Id.*, p. 187.

---

[3] "The public interest in its broader concept will be better served by integration of the debtor into a large railroad system than by its continued operation as an independent railroad.

.      .      .      .      .

"The effect of a merger upon the Southern Railway system and Seaboard Air Line Railroad Company, if any, will not adversely affect the public interest.

.      .      .      .      .

"The record is sufficient in all respects for a determination of the issue of the public interests involved in an acquisition of the debtor's properties by the Coast Line.

"It will be compatible with the public interest for the Coast Line to control the debtor's property.

"While the plan proposed by the Coast Line is inequitable in that it does not provide for the full equitable equivalent of the rights to be surrendered by the debtor's creditors, the plan as hereinabove modified will comply with such requirements, will be fair and equitable, and otherwise in the public interest."

[4] "The interests of the railroad employees affected by the merger will be adequately protected."

[5] "There should eventually result savings through a unification of the two carriers of between $850,000 and $1,000,000 per annum, through (*a*) eventual unification of the executive and supervisory forces of the two carriers; (*b*) consolidation of interchange yards and shop facilities at Jacksonville; (*c*) unification of operations of the freight stations of the two carriers at Jacksonville; and (*d*) coordination and consolidation of off-line traffic offices of the two carriers."

—would result in a betterment of service to the public.[6]  *Id.,* p. 187.

—would not adversely affect the citizens and communities of the east coast of Florida.[7]  *Id.,* pp. 187–188.

—would give the debtor greater financial stability.[8]  *Id.,* p. 188.

—would give a better service than service under an operation by St. Joe Paper Co.,[9] petitioner in No. 24.  *Id.,* p. 188.

We are not asked to set aside those findings.  They are indeed not challenged.  On their face they plainly meet the *standards* of § 5 of the Interstate Commerce Act.  We cannot say on this record that they are not consistent with § 5 within the meaning of the consistency clause of § 77 (f).  So far as this record shows, the Commission has faithfully, painstakingly, and conscientiously performed the obligations which § 5 of the Interstate Commerce Act

---

[6] "There would be betterment of service to the public resulting from a unification of the debtor's line with that of the Coast Line."

[7] "The apprehensions of the citizens and communities of the east coast of Florida that a merger would adversely affect their interests are not justified since (*a*) it would be to the interest of the Coast Line to serve all its territory impartially, (*b*) existing through routes via Jacksonville will be maintained, and (*c*) while the Coast Line would attempt to retain its long haul, its appeal to the public would be based primarily on the quality of its service, and the traffic relationships between trunk-line carriers would prevent any abuse of power such as would be possible under control of the debtor's line by the St. Joe Company."

[8] "The merger of the debtor with the Coast line will be of appreciable benefit in assuring greater financial stability for the debtor."

[9] "In general, there is a substantial preponderance of evidence that a merger will insure a more adequate, economical, and efficient transportation service than will operation of the debtor by the St. Joe Company."

imposes on it. It would seem obvious, therefore, that the Commission should be allowed to submit the plan, including the provision for a merger, to the security holders for their approval or disapproval.

The Court, however, disallows the submission and rests its action on a curious reason. It says that consent of the railroads has not been obtained and without that consent no merger can be consummated in § 77 proceedings. But that reason is wholly at war with the statutory scheme of railroad reorganizations.

Once a petition for reorganization is approved, the court appoints trustees who have full management of the business under the court's supervision. § 77 (c). The trustees take over the functions of the officers and board of directors. But apparently the Court, when it refers to "the debtor," does not mean the trustees, for it speaks of "those who in the absence of § 77 would wield the corporate merger powers." That must mean either the old management or the stockholders. Yet such a reading cannot square with § 77. One can look through § 77 in vain for any status granted the old management to approve or disapprove a plan. "The debtor" commonly is identified with the stockholders, i. e., the equitable owners of the road. But the method of getting their consent to any plan of reorganization is prescribed in § 77. They may or may not be entitled to vote, depending on whether their stock represents a value in the railroad. If the stock has no value, they are not entitled to vote. If it has value, they are entitled to vote. § 77 (e). If the security holders who have a vote approve the plan, the consent necessary to effect both the recapitalization and the merger has been given. *To allow the old management or the stockholders a veto power where Congress has provided they shall not vote is to indulge in as bold a piece of judicial legislation as one can find in the books.*

It is said that the consistency clause of § 77 incorporates by reference § 5 of the Interstate Commerce Act. And so it does. But that does not mean that because the initiation of merger plans rested with the management *prior* to bankruptcy, it rests with the old management *after* bankruptcy. The conclusion that it does reveals a basic misunderstanding of the system of bankruptcy reorganization contained in § 77. When Congress designed that legislation, it prescribed precisely how the consent necessary for each step in the reorganization should be obtained. Section 77 gives the old management no vote on any measure. If the equity votes, the stockholders cast the ballot. And a procedure is designed to deprive them of a vote if their securities no longer represent any value, as is the case here.

No comfort can be found in § 77 (d), which gives the debtor, *i. e.*, the old management, standing to propose a plan of reorganization. Plans of reorganization may be *proposed* by the debtor, by the trustees, by 10 percent of any class of creditors or of stockholders "or with the consent of the Commission by any party in interest." § 77 (d). The proposal of a plan expresses merely the wish. In logic and in history there is no reason why a plan containing a merger may not be proposed by the new management as well as the old, by creditors as well as stockholders. Standing to present a plan has no relevancy to the fairness or feasibility of the plan presented. To say that only "the debtor" may submit a plan that contains provisions for a merger is to give a whip hand to people who do not even have enough of an interest to vote on a plan. The debtor commonly represents the equity; and when, as here, the equity is so far under that it can have no possible interest in the reorganization (except possibly a nuisance value created by long-drawn-out litigation), it violates all sense of fairness

and disregards the mandate of Congress to let the equity have the preferred position the Court now creates. Congress has set the standards for the protection of the "equitable owners." Where, as here, they have no value in the enterprise, Congress said they should be disregarded.

Much emphasis is placed by the Court on S. Rep. No. 1170, 79th Cong., 2d Sess. 80–85, a report by the Senate Committee on Interstate Commerce headed by Chairman Wheeler. There are two reasons why that Report is irrelevant to the present issue. *First,* that Report condemned the use of § 77 "to bypass" § 5 of the Interstate Commerce Act. As I have shown, § 5 was not "bypassed" in the present case. The procedures, safeguards, and standards it prescribes were fully satisfied by the Commission. *Second,* that Report covered a bill which endeavored to make changes in the existing law and practices. *But that bill never was enacted. It is, however, now used as an authoritative interpretation of a law which it sought to change.*

An unjaundiced reading of § 5 of the Interstate Commerce Act and of § 77 of the Bankruptcy Act results, I submit, in the following conclusions:

Any person with standing to submit a plan of reorganization may include in it provisions for a merger.

Section 5 of the Interstate Commerce Act provides the standards for the Commission to apply in passing on such a plan and those standards have been wholly satisfied here.

Section 77 prescribes the *procedure* for getting the consent to a plan, including a plan that provides for a merger.

What reason then can there be for not letting the security holders vote to adopt or reject this plan?

It is said that if the security holders reject the plan, the reorganization court may nonetheless force it on them.

There are several answers to that, as I have already suggested:

(1) The security holders may not reject the plan.

(2) Even if they do reject the plan, the reorganization court may decide not to force the plan on them. To force it on them the court must have a hearing and find, among other things, that the rejection "is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts . . . ." § 77 (e).

(3) Even if the reorganization court undertook to force any plan on the security holders, we might well overrule that order. In the only case of the "cram down" provision on which we have passed, *R. F. C.* v. *Denver & R. G. W. R. Co.,* 328 U. S. 495—one involving issues different from those now tendered [10]—we reserved decision on the power of the reorganization court. We said, p. 535:

> "this does not mean that if a plan is approved as fair and equitable by the Commission and the court, there cannot be a reasonable justification for its rejection by a class of claimants on submission. Reasons to make their rejection reasonable may arise . . . ."

I say we might well stop any attempt of the court to invoke the "cram down" provision because we cannot tell in advance what a particular situation might disclose. Under § 77 (e), it will be remembered, "more than two-thirds" of each class entitled to vote can vote for a plan and force it on the minority. Unanimous consent is not necessary.

(1) Suppose the election returns bring approval by a bare two-thirds. Suppose the judge is satisfied that one

---

[10] See note 11, *infra.*

block of securities voting against the plan has a special ax to grind, as the Commission suggests is true in this case of the St. Joe Paper Co., petitioner in No. 24. Would it be unlawful for the court to invoke the "cram down" provision in that case? "Consent" has not been obtained since Congress provided that "more than two-thirds" should approve a plan. But the public interest might well justify use of the "cram down" provision in that case as the only effective method for dealing with a recalcitrant (or even blackmailing) minority. In light of what we said in the *Denver & Rio Grande* case (328 U. S., at 535) such rejection by the one-third minority might well be deemed to have no "reasonable justification" in light of all the facts and circumstances.

(2) Suppose the election returns bring approval from only 1 percent of the security holders. Could the "cram down" provision properly be invoked in that case? It is difficult even to imagine a case where it would be proper to do so. The "cram down" is a harsh remedy, the use of which would require special reasons.

But the fact that the occasions for its use should be closely guarded should not mean that it can never be used in connection with a § 77 plan of reorganization involving a merger, unless "the debtor" (here representing security holders not even entitled to vote on a plan) proposes the merger. Under § 77 and § 5 of the Interstate Commerce Act, read together, it is plain that Congress subjected plans containing mergers to the same "consent" requirements as plans not containing mergers. There is not a word in the statute or in the legislative history to indicate that the old management or stockholders not entitled to vote on a plan nevertheless have a veto over it.

The question of the application of the "cram down" provision of § 77 *to plans involving mergers* has never been

presented to us.[11]   That question is premature here, for it may never be reached.   It is a large question of great importance and one that should be decided, not in the abstract, but only on the specific facts of specific cases. In these cases we should specifically reserve decision on it until it is presented.   We should affirm the judgment in these cases, allowing the plan to be submitted for approval or rejection, explicitly saving the rights of all parties in case the "cram down" provision is used against them.

---

[11] We have considered the "cram down" provision of § 77 (e) only once.   See *R. F. C.* v. *Denver & R. G. W. R. Co.*, 328 U. S. 495, 531.   A merger was involved in that reorganization but it was not at issue before this Court.   The complaint there was by junior creditors on matters that were purely financial: that the valuation and allocation of securities proposed had left them too small a participation.   We decided that the "cram down" provision could be and was in that case constitutionally and properly applied.   On the facts we held that the objecting class was without "reasonable justification," since it complained only of financial aspects of the plan which were fair and equitable.   We made no decision regarding mergers and laid down no rule of law.   We left the reorganization courts free to confirm or reject future plans as the facts, the equities, and the votes required.