See also, 71 F.Supp. 472.

In re BOSTON TERMINAL CO.

No. 63870.

United States District Court
D. Massachusetts.

June 26, 1951.

Tyler, Eames & Reynolds, George B. Rowlings, Boston, Mass., for petitioning creditors.

Brickley, Sears & Cole, Boston, Mass., for debtor, Boston Terminal Co.

George Roewer, Roewer & Reel, Boston, Mass., for International Brotherhood of Red Caps.

Paul E. Troy, Boston, Mass., for trustees of Boston & Providence R. Corp.

Henry E. Foley, Sp. Asst. Corp. Counsel, George J. Leary, Boston, Mass., Boston Law Dept., for City of Boston.

Donald C. Starr, Boston, Mass., for trustees of Boston & Providence R. Corp.

Frank R. Bruce, New York City, for group of individual bondholders.

Edward H. Miller and Scribner & Miller, New York City, for group of individual bondholders.

David Burstein, Boston, Mass., for group of individual bondholders.

Joseph N. Welch, Boston, Mass., for group of individual bondholders.

Samuel Eisenstadt, Boston, Mass., Harold F. Levin, New York City, for Harry Gordon and other bondholders.

Wilfred S. Mirsky, Boston, Mass., for City Cab Ass'n.

Joseph C. Duggan, New Bedford, Mass., for Checker Taxi Co.

William L. Parsons, Boston, Mass., for New York Cent. R. Co.

John A. Brennan, Division of Employment Security, Boston, Mass., for Commonwealth of Massachusetts, Division of Employment Security.

Geo. H. Fernald, Boston Mass., for New York Cent. R. Co., a stockholder.

Herrick, Smith, Donald & Farley, Phillips Ketchum, Boston, Mass., for Boston & Albany R. R.

Robert H. Davison, Haussermann, Davison & Shattuck, Boston, Mass., for Webster and Atlas Nat. Bank of Boston and Old Colony Trust Co.

Hibbard Richter, Boston, Mass., for Hibbard Richter, guardian for Georgiana M. Hathaway.

James F. Connolly, Boston, Mass., for estate of John Roessle, bondholder.

Clarence H. Barnes, Atty. Gen., George P. Drury, David H. Stuart, Asst. Attys. Gen., for Commonwealth of Massachusetts.

James N. Clark, Boston, Mass., for trustee of debtor.

FORD, District Judge.

On June 19, 1950, the Interstate Commerce Commission (hereinafter called the

Commission) by its order approved a plan of reorganization for the debtor Boston Terminal Company (hereinafter called Terminal Company, or debtor). A petition pursuant to § 77, sub. d, 11 U.S.C.A. § 205, sub. d, of the Bankruptcy Act for a modification of the plan approved was timely filed by an intervener-bondholder; hearings were held and on November 6, 1950 the Commission denied the petition for modification, affirmed its findings and conclusions of the report of June 19, 1950 and issued a supplemental order approving the plan originally promulgated on June 19, 1950 and certified it to this court in accordance with the provisions of § 77, sub. d, of the Bankruptcy Act. The plan is now before the court for approval.

■ A single bondholder, who did not appear in the proceedings before the Commission, owning bonds in the amount of $10,000 out of the principal amount of $15,155,000 filed objections to the plan. The objections filed were (a) that the plan as proposed was inequitable and unfair to the interest of the bondholders, (b) that the plan would compel acceptance of an inadequate amount for the surrender of valuable rights and interests which could be enforced against third persons and (c) that the plan would result in unjust enrichment of others at the expense of the bondholders. Although these objections did not meet the requirements of § 77, sub. e, of the Bankruptcy Act in that they were general objections and not detailed and specific, this court, pursuant to § 77, sub. e, of the Act heard counsel for the intervener-objector on his objections to the plan. Little of merit was advanced in support of the objections. However, this circumstance does not allow a court in approving a plan to do so without filing an opinion, § 77, sub. e, and I turn to the question whether the plan satisfies the requirements of § 77, subs. b, and e, of the Bankruptcy Act. There is no controversy here among creditor groups. There is only one group of creditors, the bondholders, and the plan provides for modifying or altering their rights, § 77, sub. b (1). Section 77, sub. b, (5) has been satisfied, as adequate means for the execution of the plan are provided. Section 77, sub. e, (3) has been fully satisfied. In fact, it appears that the only question before this court is whether the plan is fair and equitable and affords due recognition to the rights of the bondholders of the Terminal Company. § 77, sub. e, (1).

There would be little point in outlining all the various phases of the litigation in the courts concerning the Terminal Company since the reorganization proceedings were instituted in 1939 as a result of an order of Judge Hincks of the Connecticut Court directing the New York, New Haven and Hartford Railroad Company (hereinafter called New Haven) to withhold the contribution for taxes and interest on Terminal Company's mortgage bonds made by the New Haven estate in behalf of its lessor railroads, Old Colony and Boston and Providence, to the Terminal Company under the provisions of Chapter 516 of the Massachusetts Acts of 1896.

On July 15, 1947, the Webster and Atlas National Bank of Boston (now Rockland-Atlas National Bank of Boston) trustee under the indenture of mortgage securing the bonds of the Terminal Company (hereinafter called the mortgage trustee) filed a plan of reorganization. On December 14, 1949, the mortgage trustee filed an amended plan. From this amended plan, with alterations, the present plan evolved and was certified to this court. It is predicated upon an offer by New Haven and the New York Central Railroad Company (hereinafter called New York Central) which, as lessee of the Boston and Albany Railroad Company, uses, at the present time, the Terminal Company's facilities along with New Haven. It is in essence an over-all compromise of all the claims which required settlement as a result of the operation of the Terminal Company.

The plan approved by the Commission is relatively simple and provides that the present corporation would be continued or a new corporation organized by the New Haven and New York Central to take over the Terminal Company, free and clear of all claims and encumbrances, including claims against the estate of the

Boston and Providence Railroad Corporation, now in reorganization in this court. The stock of the reorganized Terminal Company would be wholly owned by these using railroads in such proportion as they themselves determine subject to any approval required by law. The New Haven and New York Central would pay cash in the sum of $9,765,500 in addition to $159,-668.06 [1] required to restore the fund of $1,693,485.70 paid by the New York Central on account of its obligations as a using railroad under Chapter 516 of the Massachusetts Act of 1896; pay or agree to assume (a) all valid claims of priority creditors of the Terminal Company and all secured claims, if any, of the City of Boston for water rates; (b) all valid unpaid administration expenses and liabilities incurred during the reorganization of the Terminal Company, including tort actions arising out of the operation of the debtor's property during reorganization; (c) all valid fees and expenses of reorganization of the debtor; (d) all taxes due the United States, subject to certain conditions; (e) an amount equal to $21,000 a month from January 1, 1950 to the date of the consummation of the plan, this to be added to the cash otherwise distributable to the bondholders of the debtor under the plan. The plan further provides that upon its consummation the New Haven deliver to the mortgage trustee out of the stock reserved for unliquidated claims against

the New Haven 75,775 shares of the common stock of the New Haven together with certificates of beneficial interest [2] appurtenant to such shares for distribution by the mortgage trustee pro rata among the bondholders of the debtor. [3]

The plan also provides that the trustee of the Terminal Company pay to the mortgage trustee the sum of $1,693,485.70 now held and heretofore paid by the New York Central for its use of the terminal under the provisions of Chapter 516 of the Massachusetts Acts of 1896. There is also held at the present time by the mortgage trustee the sum of $299,938.09 for the benefit of the bondholders, (received from federal government for land taken for a post office). Under these provisions distribution would be made to each holder of $1,000 principal amount of bonds of approximately $776 in cash together with five (5) shares of common stock of New Haven with certificates of beneficial interests. (At the hearing it was estimated there was a fair probability that the certificates would carry an additional five shares.) [4] Thus it is apparent in the overall picture that each bondholder would receive an amount reasonably approximating $1,000 for $1,000 bond at present value. This computation does not take into account the additional sums afforded by the payment of $21,000 a month to consummation date of the plan nor the value of assumed obligations.

1. This amount has been paid out of the sum of $1,693,485.70 for counsel fees and expenses.

2. The Connecticut court by its Order No. 1028 of May 19, 1948 provided that on issue each share of common stock distributed to holders of common claims should carry with it a certificate of interest attesting the right of each holder thereof to receive, when all common claims had been allowed and creditors had received stock therefor dollar for dollar, a proportionate part of the remainder of the stock that had been reserved to satisfy common claims and not paid out. Of the entire authorized common stock, 604,669 shares had been reserved for future issue to satisfy common claims that had not

been allowed prior to the consummation date of the New Haven plan.

3. Judge Hincks in the Connecticut court, by order dated March 2, 1951, allowed the unsecured claims of the Boston Terminal Company and the mortgage trustee and authorized the New Haven in liquidation of the claims to distribute 75,775 fully-paid shares of the New Haven common stock plus Certificates of Interest upon approval and confirmation of the Terminal Company plan. This order was affirmed on appeal in Connecticut Railway & Lighting Co. v. New York, New Haven and Hartford Railroad Co., 2 Cir., 1951, 190 F.2d 305.

4. New Haven common stock during 1951 has ranged in market price from 25⅜ to 15⅜.

## The Claims.

The United States District Court for the District of Connecticut which had jurisdiction of the New Haven reorganization proceedings by Order 398 entered on October 20, 1939, directed the New Haven trustees not to make any further payments to the Terminal Company in respect of bond interest, real estate taxes to the City of Boston or franchises taxes payable by it. As a result, the Terminal Company could not pay its November 1, 1939 bond interest and proceedings for reorganization were commenced on November 3, 1939 in this court. Order 398 was affirmed in Palmer v. Webster & Atlas Nat. Bank, 312 U.S. 156, 61 S.Ct. 542, 85 L.Ed. 642. After the entry of Order 398 the New Haven trustees continued to pay 70% of the net operating expenses of the Terminal Company, exclusive of bond interest, but paid no part of the Terminal Company's real estate taxes. The New York Central continued to pay the City of Boston 30% of the taxes on the terminal and also paid 30% of the net operating expenses, including 30% of the bond interest payable by the Terminal Company, hence the $1,693,485.70 now held by the trustee for the Terminal Company.

The New Haven plan as finally approved by the Connecticut District Court by order of September 6, 1948, and affirmed in Old Colony Bondholders v. New York, New Haven & Hartford Railroad Co., 2 Cir., 161 F.2d 413, provided by Article N 1(a) that the charters of the New Haven and Old Colony be amended so as to release them from any obligations to use the terminal imposed by § 9 of the Massachusetts Terminal Company statute of 1896 and from any obligation under § 10 of the Massachusetts Act to make any payments for such use if and when such use would be discontinued. Also it provides that the obligation of New Haven and Old Colony to make payments on account of interest and principal on the bonds, after the date on which the trustees made their last payments on account of interest on the bonds (August 1, 1939) would be satisfied by the payment of a proportional percentage of $275,000 per annum ($536,240 was annually due on these bonds). The Article also provided that the obligation to pay operating expenses pursuant to § 10 of the Massachusetts Act of 1896 be limited to operating expenses less revenues from rentals and concessions. See, In re New York, New Haven & H. R. Co., 2 Cir., 147 F.2d 40 and Old Colony Bondholders v. N. Y., N. H. & H. R. Co., 2 Cir., 161 F.2d 413 as to the legality of these provisions of the New Haven plan. The provisions for abrogation of the use obligation and for abrogation of the obligation imposed by § 4 of the Terminal Company statute with respect to payments of principal and interest on the bonds were absolute, but the provisions modifying the payment obligation of § 10 were conditioned on acceptance by the Terminal Company. If the Terminal Company through its trustee accepted the offer, it would waive any claim for abrogation of use imposed by § 9 of the Terminal Company statute, and also it would waive its claim for use of the Terminal Company's facilities during the bankruptcy of New Haven and Old Colony. If the offer was rejected as proposed by the New Haven plan, the trustee could file a claim for damages as an unsecured creditor and under Article J (17) of the plan would be entitled to receive common stock for his claim against New Haven (Old Colony was insolvent and unsecured creditors were entitled to nothing; also there was no provision in the New Haven plan by which all of Old Colony's assets were transferred to New Haven that the latter would assume the obligations arising from the claims of the Terminal Company or its bondholders) for abrogation of use imposed by § 9 of the Massachusetts Act and also a claim for use during reorganization; in addition, on rejection, the trustee could exclude these railroads from further use of the Terminal Company's facilities. Of course, neither acceptance nor rejection could affect the rights of the bondholders arising out of the abrogation of the obligation imposed on these using railroads by § 4 of the Terminal Company statute with respect to a deficien-

cy on foreclosure of the mortgage securing the Terminal Company bonds. Old Colony Bondholders v. N. Y., N. H. & H. R. Co., 2 Cir., 161 F.2d 413, 426. On August 26, 1947, the trustee of the Terminal Company under instructions of this court rejected the offer in Article N 1 (a) of the New Haven plan and, as directed by the court on August 27, 1947, on September 5, 1947 filed in the New Haven proceedings in Connecticut a proof of claim for abrogation of the use provision of § 9 of the Massachusetts statute. It also filed a claim against the insolvent Old Colony estate. No administration claim against New Haven or Old Colony for use during the reorganization proceedings has been filed.

The claim of the bondholders arising from abrogation by the New Haven plan of the obligations imposed by § 4 of the Terminal Company statute is contingent on foreclosure and unliquidated in amount. The obligation under § 4 of the 1896 Act is not a guaranty of the bonds; it is only an indemnity obligation to make good any deficiency on a foreclosure of the mortgage securing them. The New Haven plan could not lawfully destroy this contingent right. Also, after the deficiency is ascertained, it has to be apportioned between the several railroad obligors by the Supreme Judicial Court of Massachusetts. Old Colony Bondholders v. N. Y., N. H. & H. R. Co., 2 Cir., 161 F.2d 413, 426, 427. For these reasons no claim has been filed on behalf of the bondholders in the Connecticut court.

As stated above, the common creditors are entitled to receive common stock of the New Haven in satisfaction of their claims and by Order 1016 (April 3, 1948) stock has been reserved for this purpose. As disclosed 75,775 shares of the common stock of New Haven are part of the offer in the plan made by the New Haven and New York Central.

#### The Assets and their Valuation.

I now direct my attention to a consideration of the assets of the Terminal Company which are to be surrendered by them under the proposed plan. The assets of the Terminal Company are (1) its land and buildings thereon; (2) cash held by the mortgage indenture trustee representing the balance of proceeds from a taking of part of its real estate by the federal government for a post office; (3) cash in the special bond account; (4) the claims already set forth and further claims against the railroads which would arise out of such use of the Terminal as may be made by them in the future; (5) a claim against the Commonwealth of Massachusetts for franchise taxes paid under protest before the present reorganization proceedings were instituted. The Commission in valuing the Terminal Company's physical property considered the balance sheet data of the debtor, the statements of the result of operations, the Commission's Bureau of Valuation Report on elements of value for rate making purposes, and the testimony of John C. Kiley, a Boston real estate expert, who testified before the Commission on November 3, 1947, on the then pending plans. He valued the property at $9,500,000 for railroad purposes and $6,500,000 for non-railroad purposes. In recent years ending on December 31, 1949, the City of Boston has compromised the real estate taxes on the property on the basis of a valuation of $6,000,000. The Terminal Company, as such, is not engaged in a self supporting enterprise, but is dependent upon continued use by the railroads for terminal purposes. The Commission found that the station building has little or no utility other than as a passenger station and was obsolete for present day purposes. If the station building were demolished, expert Kiley testified: "The unimproved land could be utilized for parking purposes, or for combined purposes of outdoor parking and a small railroad terminal." The Commission concluded that because of increased costs of operation and enormous decrease in passenger business and decline in value of the Terminal Company property as measured by the value of adjacent real estate a fair rental value of the property would be $275,000 per annum and this capitalized at 4% would produce a figure of $6,875,000. Also, it may be noted that capitalization at 4% of the rental of $21,000 a month from January 1, 1950 to the date of the consummation of the plan,

which is made in the present proposed plan, would produce $6,300,000. (These capitalizations were regarded as guides, not decisive bases.)

■ The Commission in its Supplemental Report and Order of June 14, 1950 found the value of Terminal Company's physical assets to be $7,000,000. Under § 77, sub. e, of the Bankruptcy Act the matter of the valuation of the Terminal Company is committed exclusively to the Commission. The determination must be based upon material evidence in accordance with legal standards and not contrary to the statutory requirements. Ecker v. Western Pacific R. Corp., 318 U.S. 448, 472, 477, 63 S.Ct. 692, 87 L.Ed. 892. The determination of valuation made by the Commission was not contrary to any legal principle this court is cognizant of; it was based on substantial evidence and it must be accepted by this court for the purposes of this proceeding.

### Valuation of the Claims.

■ The question as to whether the Commission had power to value the claims of the Terminal Company set out above, though not raised in the present proceedings, was considered by the Commission and the latter concluded that these represented claims against third persons which it had the exclusive power under § 77, sub. e, to value and not claims against or liabilities of the Terminal Company, the amount and priority of which this court should evaluate. These conclusions were correct. § 77, sub. e, of the Bankruptcy Act.

■ In evaluating the claims the Commission pointed out in its report of November 6, 1950 that the detailed analysis of the claims it made in its report of June, 1950, indicated there is a great uncertainty as to what recovery, if any, would be obtained if the claims were litigated to a final conclusion in the several courts having jurisdiction. The November report cited some examples of the legal uncertainties surrounding the claims and also took into consideration the fact that any claim against the Boston and Providence Railroad Corporation would have to compete with the operational claims of New Haven against the Boston and Providence Railroad Corporation, which latter railroad the New Haven has been operating since the rejection of its lease to New Haven. The operation of Boston and Providence resulted in large losses. There is no necessity of repeating here the obvious, namely, that it would take years of time and enormous expense with uncertain results finally to liquidate these claims. The settlement of claims such as are present here by compromise in reorganization cases is approved by the courts. Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 130, 60 S.Ct. 1, 84 L.Ed. 110; In re Prudence Co., Inc., 2 Cir., 98 F. 2d 559. See also opinion of Judge Swan in Connecticut R. & Lighting Co. v. New York, N. H. & H. R. Co., 2 Cir., 1951, 190 F.2d 305.

After analyzing the various claims of the debtor, the Commission evaluated them as not in excess of $4,175,168, the difference between the value of the Terminal Company's physical property ($7,000,000) and the cash to be provided by New Haven and New York Central and value of the 75,775 shares of New Haven stock plus the beneficial certificates (estimated at $1,250,000) to be turned over for distribution to the bondholders. The matter of the valuation of the claims was, as with the physical property, within the exclusive jurisdiction of the Commission, the determination was beyond any doubt based upon a careful consideration of all the evidence and the complex and almost insuperable difficulties involved and met all legal rules that have been brought to my attention. If the matter of the valuation of these claims was solely within the province of this court, I would have reached the conclusion that the compromise value placed on the claims by the Commission was just and reasonable.

■ I have considered all aspects of the matters involved in the question as to whether the bondholders of the Terminal Company will receive a fair equivalent for the rights surrendered by them. I have, I believe, adequately set forth what they are giving up and what they are receiving in the proposal of the New Haven

and New York Central. I find that the bondholders, as demonstrated above, under all the circumstances of the problems involved are receiving a fair equivalent for the rights surrendered by them.[5]

The suggestion of the present single objector that we pause to litigate with respect to certain legal points involved is entirely without merit. I shall not recite in detail the points raised but will say that practically all which were stated with such particularity that I could understand them, have been dealt with and determined in the litigation over the years. However, one technical aspect of the plan should be clarified. The objector raised the question as to whether the plan required a release or assignment of the bondholders' deficiency claim under § 4 of the Terminal Company Act. As stated, the court in Old Colony Bondholders v. N. Y., N. H. & H. R. Co., 2 Cir., 161 F.2d 413, at page 427, determined that the obligation running to the bondholders under § 4 of the Terminal Company Act with respect to a deficiency upon foreclosure of the mortgage was in the nature of an indemnity and no claim could come into existence until there was a foreclosure of the mortgage. The deficiency, when determined, was to be apportioned by the Massachusetts Supreme Court between the several railroad obligors. The bankruptcy court in Connecticut had no power to foreclose the mortgage nor apportion any deficiency. The claim is an independent claim running to the bondholders against the using railroads and additional to the claim of the bondholders against the Terminal Company for the bond principal and interest secured by the mortgage upon the Terminal Company's real estate. The obligation under § 4 could not, of course,

be abrogated by the New Haven plan without provision for a claim which might be established by the bondholders as a result of the abrogation. However, a plan of the Terminal Company does not have to provide for a foreclosure of the mortgage as the only basis for reorganization in order that the bondholders may have an opportunity to liquidate a claim in the New Haven reorganization. A Terminal Company plan is lawful which affords the bondholders fair and equitable treatment by providing a method for proving their claims, as does the present plan, after taking into account the reasonable probable consequences of a foreclosure. It is true the present plan provides for the satisfaction of the mortgage, takes away the right of foreclosure, and makes the indemnity requirement unenforceable, yet there is nothing unlawful in this, as the Commission has the power and right to determine whether a foreclosure should take place in the public interest. In re Boston Terminal Co., D.C., 71 F. Supp. 472. However, although the plan may deal with the bondholders' contingent claim dependent on a foreclosure of the mortgage upon the debtor's property, the bondholders or the mortgage trustee should not be required to release or assign any claims for possible deficiency arising out of § 4 of the Terminal Company Act as the bondholders are not creditors of the Terminal Company but are a separate group of creditors, not subject to the Commission's jurisdiction and not bound by the present plan with respect to this claim.

I conclude that the plan under consideration complies with the provisions of § 77, sub. b, of the Bankruptcy Act; it is fair and feasible and affords due recognition to the right of the bondholders.[6]

5. The Commission found, and correctly, that since the bondholders' claims would not be satisfied in full, the claims of unsecured creditors and of the holders of stock (the using railroads under the Massachusetts Act of 1896) were without value.

6. The plan is approved before time for certiorari proceedings in the Connecticut

Railway & Lighting Co. case has elapsed. There is no harm in this as the plan cannot be confirmed if the Supreme Court finally sets aside the order of the Connecticut court. Moreover, it is desirable to shorten the time for possible appellate proceedings herein this seemingly never-ending litigation.

An order will issue approving the plan and a certified copy of this opinion and order will be sent to the Interstate Commerce Commission.