In the Matter of BOSTON AND PROVIDENCE RAILROAD CORPORATION, Debtor.

No. 62413.

United States District Court
D. Massachusetts.

July 24, 1956.

See also, 103 F.Supp. 23.

---

James Garfield, Boston, Mass., for New York, New Haven & Hartford R. R.

Donald C. Starr, Boston, Mass., for debtor corporation.

Armistead B. Rood, Washington, D. C. (Casius Clay, Joseph B. Hyman, New York City, of counsel), for Boston and Providence Development Group.

Paul E. Troy, Boston, Mass., for Charles W. Mulcahy, Boston, Mass., Trustee of debtor corporation.

Nutter, McLennen & Fish, Boston, Mass., Ralph Montgomery Arkush, Lewis M. Dabney, Jr., New York City (Jacob J. Kaplan, Boston, Mass., of counsel), for stockholders (Freeman) committee.

Donald T. Field, Boston, Mass., for stockholders (Field) committee.

FORD, District Judge.

On January 15, 1954, the Interstate Commerce Commission (hereinafter called the Commission) filed in this court its Fourth Supplemental Report dated January 5, 1954, approving an amended and modified plan for the reorganization of the Boston and Providence Railroad Corporation (hereinafter called B & P).

Objections to the plan within the time appointed by the court (March 21, 1956) were filed by various groups of stockholders (Freeman Committee, Boston and Providence Development Group, Field Group),[1] and counsel for the debtor. Hearings on the plan were held May

1. The Freeman Committee became active in these proceedings in 1948. It was organized in 1943. The other groups came into these proceedings much later, the Field Group appearing a few weeks before this hearing.

15 and 16, participated in by all parties in interest.[2]

The plan approved by the Commission in its Fourth Supplemental Order of January 5, 1954 is the third plan certified to this court. The plan approved March 22, 1940 and that of July 13, 1943 were disapproved by the court and referred back to the Commission on February 12, 1942, D.C., 43 F.Supp. 327, and on February 25, 1948, D.C., 76 F.Supp. 185, respectively.

B & P is an old corporation, chartered in 1831. On April 7, 1888, the debtor executed a lease of its properties to the Old Colony Railroad Company for a term of 99 years beginning April 1, 1888, and the debtor has not carried on any railroad operations since April 11, 1888. On February 15, 1893, Old Colony leased all its properties which included its leasehold interest in B & P's properties to the New York, New Haven and Hartford Railroad Company (hereinafter called New Haven) and since that time the New Haven, its trustees, or the reorganized New Haven have operated the debtor's properties.

New Haven filed a petition for reorganization on October 23, 1935 and Old Colony on June 3, 1936, the latter's lease to New Haven having been rejected on this date by New Haven, filed its petition in the Connecticut court in the same proceedings. The New Haven trustees paid the lease rental to B & P from 1935 until July 19, 1938, at which time the Connecticut court instructed New Haven's trustees and Old Colony's trustees to reject the B & P lease, which they did. B & P had appeared generally in the New Haven proceedings on May 27, 1937 and opposed the rejection of the lease.

See Palmer v. Warren, 2 Cir., 108 F.2d 164, 168. After the rejection of B & P's lease the New Haven trustees operated B & P's properties, see Palmer v. Warren, supra, 108 F.2d at page 165, until the consummation of the New Haven reorganization and since then for the account of B & P under the provisions of § 77, sub. c(6) of the Bankruptcy Act, 11 U.S.C.A. § 205, sub. c(6). New Haven's proceedings were consummated on September 18, 1947.[3]

The plan dated July 13, 1943 and disapproved by this court February 25, 1948 provided that the consideration to be paid by New Haven for the property of B & P should consist of (1) $3,039,-213 principal amount of New Haven first and refunding 4% fixed interest bonds, (2) $1,467,520 principal amount of New Haven 4½% income bonds and (3) $1,-467,520 par value of New Haven preferred stock.[4] There were further provisions, among them, the assumption by New Haven of the reorganization expenses of the B & P, current liabilities incurred by it prior to the institution of its reorganization, current liabilities of debtor's trustee, and all taxes due from debtor or its trustee. Also, the plan provided for the cancellation of all claims held by New Haven or its trustee or the Old Colony trustees against B & P or its trustee and all claims held by B & P or its trustee against New Haven or the Old Colony or their trustees.

The plan was rejected because (a) it was incapable of performance because of the continued accrual of interest on the B & P's debentures since the date when the Commission expected the plan to be put into effect; (b) the plan contained no provisions for dealing with claims

2. Delay in hearings on approval of plan was caused by further proceedings before the Commission, in the United States District Court for the Eastern District of Virginia, and the Supreme Court of the United States.

3. Judge Hincks approved the New Haven plan on March 6, 1944, In re New York, N. H. & H. R. Co., D.C., 54 F.Supp. 631. The plan approved a price to be

paid for B & P. See 54 F.Supp. at page 618.

4. It has been generally recognized by all the parties to these proceedings that the only feasible manner to effect a reorganization of B & P is by a sale of B & P's properties to New Haven (the only party that can buy it). A lease is out of the question as New Haven will not consent to it.

ranking equally with the debentures which might be allowed after consummation; (c) the plan made inadequate provision for the claims of the Boston Terminal Company (hereinafter called Terminal); and (4) the plan provided for distribution of securities to B & P's stockholders without fully satisfying the claims of creditors.

Nothing was said in this court's opinion in respect of the value of the debtor's properties or the price to be paid by New Haven. This court did not disapprove of the unification of B & P with New Haven. It did suggest the Commission might consider, in further proceedings, whether any factors had arisen since 1940 that would affect the price to be paid B & P. The court also noted in a footnote that the price approved in the 1943 plan was the same as that offered by New Haven in its plan, 54 F.Supp. at page 618 and adopted by the Commission in its initial report and order of March 22, 1940 approving a plan for the reorganization of B & P, which, as stated, was disapproved because it could not be made effective except in conjunction with the New Haven plan which, at that time, had not been approved.

On the return of the plan to the Commission, further proceedings were had before the Commission on various petitions filed by the debtor's trustee against New Haven that need not concern us here. On June 5, 1950, the trustee filed proposed amendments to the plan and the Freeman committee also filed a proposed plan. Hearings on the B & P plans were reopened in 1951. After hearings before examiners, reports were filed and the 1943 plan with certain modifications was approved and the Commission, on January 15, 1954, filed its Fourth Supplemental Report approving the plan now before the court. The findings and conclusions of the Commission are set forth in this report. (290 I.C.C. 363).

The modified plan now before the court[5] provides that New Haven shall acquire the assets of the debtor for the following securities: $3,039,213 face value of its first and refunding 4% bonds; $1,467,520 face value of its 4½% income bonds; and $1,467,520 par value of its new 5% preferred stock (the same price the Commission found was the value of the property since the inception of these proceedings; the price approved by Judge Hincks in the New Haven plan in the Connecticut court, 54 F.Supp. at page 618;[6] also cash in an amount equivalent to the interest and dividends which would have been payable on the above securities as if these securities had been dated and issued to debtor's trustee as of January 1, 1940. As a further consideration the New Haven was to assume and pay all obligations and liabilities of the debtor or its trustee, except the claims represented by the debentures, including (a) reorganization expenses of the debtor; (b) liabilities of the debtor incurred prior to the institution of its reorganization proceedings; (c) current liabilities of its trustee; (d) any and all taxes; (e) all claims against B & P outstanding held by New Haven or its former trustees and all claims against New Haven or its former trustees or the Old Colony or its former trustees held by the debtor or its trustee shall be cancelled. The New Haven, if plan is accepted, has agreed to waive the claims of Terminal against the debtor which had been assigned to it in the

5. The effective date in the plan, as of which date claims of creditors are to be computed, is January 1, 1954.

6. It is fair to assume that the parties in interest before accepting the New Haven plan took into consideration this price offered for B & P. The price was fixed with relation to the treatment in the New Haven plan of other parties who were creditors, vendors or lessors of property of New Haven. Consummation order of New Haven plan was affirmed by the Court of Appeals for the Second Circuit in 169 F.2d 337. The New Haven, now out of reorganization, cannot be compelled to purchase B & P. What is involved in these proceedings is not a reorganization plan in the strict sense, but the question of a fair price to be paid for B & P by New Haven for distribution to the interested parties. Cf. § 77 sub. b (5).

Terminal Co., D.C., 99 F.Supp. 916. Terminal reorganization, In re Boston Since these claims come ahead of stockholders this would have the effect under the present plan of bettering the position of the stockholders. Terminal's claims are: (1) for use of its property by B & P and abrogation of B & P's statutory obligation to use; (2) Terminal's bondholders for deficiency on foreclosure of the Terminal mortgages; and (3) claim for services in Terminal's reorganization.

The holders of B & P's debentures are to receive $3,906,000 in full satisfaction of their claims.[7] The 3,272 shares of capital stock of B & P held by its trustee in sinking fund account are to be cancelled. All other securities in sinking fund account at date of consummation are to be converted into cash which, together with all other cash on hand or in the sinking fund account, shall be applied, pro rata, to the purpose of making such payment. The balance of said $3,906,000 remaining after the application of the cash above referred to shall be paid by allotting, pro rata, to the holders of the debentures the securities of New Haven received in exchange for B & P's property. After payment to debenture holders, there is to be distributed, pro rata, to the debtor's stockholders (exclusive of the 3,272 shares in sinking fund account of the debtor, the 40 shares of debtor's capital stock held in its treasury and the 3,397 shares of the debtor's capital stock held by New Haven which are to be cancelled) all remaining cash received from New Haven and the proceeds, if any, from the sale of excess securities by the debtor's trustee, after payments to debenture holders.[8]

This plan approved by the Commission on January 5, 1954 in its Fourth Supplemental Report was reaffirmed in a Fifth Supplemental Report dated July 30, 1954, 290 I.C.C. 404, in the dismissal of a petition for modification of the plan.

The main objections to the plan are set forth in the Freeman committee's brief. (The other objections present substantially the same issues.) They may be enumerated, as they are in the Freeman brief, as follows:

I. The segregation formula as applied to the debtor is unfair, hence, the plan is unfair.

II. There is no evidence in the record of the present or prospective earning power of the debtor, hence, the reorganization value of the debtor, which will support a finding that the plan is fair.

III. The plan is invalid as involving a forced compromise of litigated claims without the consent of the interested litigants or without evidence, or appraisal of, the claims settled.

The Segregation Formula.

At the outset, the history of the "bete noire" of the proceedings (according to the objectors) applied to Old Colony in the New Haven reorganization and applied in these proceedings under the provisions of § 77, sub. c (10) of the Bankruptcy Act should be reviewed. The objectors to the plan contend that this formula was the sole basis for fixing the price to be paid for the debtor's properties. As a matter of fact, it was only

7. Based on the average market price for the period January 1 through November 30, 1953, debenture holders would receive $3,039,213 of New Haven's first and refunding bonds, $1,467,520 of New Haven's income bonds, and $1,341,192 of New Haven's preferred plus $81,000 cash from the sinking fund, satisfying the claims as of January 1, 1954, the effective date of the plan. These bonds are now held by New Haven.

8. Based on the average market price for the period January 1 through November 30, 1953, holders of the capital stock would receive approximately $3,371,524 of cash to be paid by New Haven which together with the $73,824 of cash for balance of New Haven stock issuable under the plan would produce about $103 per share for the 33,291 shares of stock (New Haven has options to buy about 12,000 of these shares) outstanding in the hands of the public. Since this plan will not be consummated until later, the amount to be received by the stockholders in back interest and dividends would be in excess of $103.

one of the various factors considered by the Commission in fixing the price. As will appear if the formula were the sole factor, the price would reach the vanishing point.

In the New Haven reorganization the trustees of the New Haven presented a formula drawn up by a committee of experts representing various interested parties for the segregation and allocation of the revenues and expenses of the New Haven system among the various segments of the system, one of which was the B & P. The Connecticut court on October 29, 1937, under the provisions of § 77, sub. c (10) of the Bankruptcy Act, referred the formula to the Commission for its recommendations. The B & P was represented by counsel at the arguments before Division 4 of the Commission, and objected to the formula on various grounds as unfair. After consideration, the Commission found that the formula was as fair and equitable as the underlying facts would permit and recommended it to the court. 224 I.C.C. 723. In its report the Commission stated: "Our recommendations herein are in no wise intended to express any views with respect to the use of the results obtained from the application of the formula or the weight to be given to such results." 224 I.C.C. 725. This report of the Commission was confirmed by Judge Hincks in the Connecticut court on May 25, 1938 by an order from which no appeal was taken.

Later, in the New Haven reorganization, the Old Colony objected to the approval of an accounting between the trustees of Old Colony and of New Haven based upon use of the segregation formula and sought unsuccessfully in the District Court to offer evidence looking to another method of division of rates between the two roads. In Palmer v. Palmer, 2 Cir., 104 F.2d 161, the use of the segregation formula was approved. The court held that Old Colony's evidence should have been presented to the Commission at its hearings on the formula and could not later be brought before the court as an original matter.

In Palmer v. Warren, 2 Cir., 108 F.2d 164, the application of the formula to an accounting between B & P and the New Haven was put in issue. In that case the order of the District Court approving the account was reversed on the ground that B & P had not been given the hearing that a previous order of the District Court had given it the right to expect. On petition for rehearing the court in a *per curiam* addendum to its opinion clarified its position by holding that "the Boston & Providence cannot now procure any change by the Commission in the 'Segregation Formula' itself", but that "the Boston & Providence is free to oppose the application by the District Court of that formula to the liquidation of its account with the debtor as freely as though Order No. 300 had not been entered." 108 F.2d at page 169.

From this it appears that the fairness of the segregation formula, as such, is not open to further litigation. The B & P had its day in court before the Commission which recommended the formula and in the District Court in Connecticut which approved the formula. Palmer v. Warren, supra, clearly precludes any reopening of the matter before the Commission. Nothing in § 77 gives this court any power to review the formula, which has already been accepted by the court which referred it to the Commission, or to make an independent determination of a proper formula. It does not appear, however, that this court is precluded from taking into account the manner in which the Commission has used the formula as one of the factors in determining the value of the debtor's properties in its consideration of the present plan of reorganization. This question will be considered in connection with the discussion of the valuation of the debtor's property. This court cannot, however, solve the issues here simply by making its own determination that the segregation formula itself is unfair and, hence, holding that any plan based, even in part, upon that formula is unfair.

Valuation of Debtor's Properties.

The second principal contention of the objectors to the plan is directed to the reorganization value of the B & P. The Commission made no express finding as to the value of the debtor's property, but, of course, a finding as to value was implicit in its finding that the price to be paid by the New Haven under the plan was fair and equitable. The contention of the objectors is that there is no evidence in the record of the present or prospective earning power of the debtor and, hence, of the reorganization value of the debtor which will support a finding that the plan is fair. Nothing in the record, they argue, would support a finding of earning power so negligible as to justify a price of less than $7,000,000 for a railroad whose elements of value were determined by the Commission's Bureau of Valuation in 1950 at approximately $26,000,000. The Commission has ignored, they say, the testimony of the expert presented by the Stockholders' Committee, who testified, on the basis of his own view of the proper allocation of earnings between B & P and the New Haven, that B & P's earnings in 1949 exceeded $2,225,000 and if B & P had been independently operated, would have exceeded $3,600,000. There has been no accounting by the New Haven since 1947 of the results, under the segregation formula, of its operation of B & P, hence, no current evidence of earning power even on this basis. Hence, they contend, there was no evidence at all on which the majority of the Commission could have based its conclusion as to value.

Before considering this question in detail, it might be well to point out the respective functions of the Commission and the court on questions of valuation. Determination of the value of the B & P property for purposes of the plan is a function limited to the Commission, without necessity of approval by the court. This court, in reviewing the Commission's determination, has open only the question of whether that determination was reached

with material evidence to support it, and by the proper application of the legal standards set forth in the statute. Ecker v. Western Pacific R. Corp., 318 U.S. 448, 472, 473, 63 S.Ct. 692, 87 L.Ed. 892. The applicable statute, § 77, sub. e, of the Bankruptcy Act, 11 U.S.C.A. § 205, sub. e, provides: "The value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual .investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts." Earning capacity is thus the basic question in the valuation of the property of a railroad for reorganization purposes. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 318 U.S. 523, 540, 63 S.Ct. 727, 87 L.Ed. 959. The court in that case further points out, 318 U.S. at page 542, 63 S.Ct. at page 739, that: "A valuation for reorganization purposes based on earning power requires of course an appraisal of many factors which cannot be reduced to a fixed formula. It entails a prediction of future events. Hence 'an estimate, as distinguished from mathematical certitude, is all that can be made.'" An appraisal of all the factors is one peculiarly adapted to be made by the expert and informed judgment of the Commission. This is so because as someone has said somewhere: "Value is a nebulous concept and made up of many imponderables."

The problem of the value of the B & P property has received the careful and repeated consideration of the Commission over a large number of years, both in connection with the formulation of the three plans approved by the Commission in this proceeding and in connection with the New Haven reorganization plans, since the contemplated pur-

chase of B & P by New Haven was included as an element of the plan in that case. In the course of repeated hearings and arguments, every possible aspect of the case would seem to have been brought before the Commission.

The only specific figures as to actual earnings were those contained in the reports filed by the New Haven covering its operation of the B & P from 1938 up to 1947. These reports, made on an accounting based on the much disputed segregation formula, indicated an operation at a loss except for some of the war years. In making the valuation, the Commission took into account the segregation formula, and the result based on its use in the New Haven accounting, as indicating that the operations of B & P were being conducted at a substantial loss. But it did not give dominant weight to this one factor. In this it has followed a consistent course throughout these proceedings. In recommending the segregation formula it recognized that there were elements of value not fully reflected in the segregation formula which should be taken into account in considering a plan of reorganization, 224 I.C.C. 729. In evaluating the B & P properties in later proceedings in connection with this and the New Haven reorganization, it has taken into consideration these other factors. Original cost, cost of reproduction new and cost of reproduction less depreciation were taken into consideration by the Commission. It had the benefit of studies made in connection with the New Haven proceedings concerning the amount of traffic contributed by B & P to the New Haven system, and the severance value of the B & P, i. e., the effect upon New Haven of the severance of the B & P lines from its system, including the probable effect upon New Haven of the independent operation of B & P as a competitor. It considered the possible alternative route which could be developed by New Haven to replace its use of the B & P lines, including the cost of developing a route and other disadvantages involved. 239 I.C.C. 465, 475.

These factors are important in the light of the fact that, as generally agreed, the only feasible use of the B & P properties is their operation as part of the New Haven system's main line between Boston and New York. This involves a purchase by New Haven of the B & P properties. The New Haven is not interested in a lease of the properties. Independent operation of the line by the B & P itself is not feasible since the B & P has no rolling stock, no operating personnel, and no operating capital. Hence, a primary consideration in evaluating the B & P properties is the question of what it is worth to New Haven to acquire these properties.

The price fixed in the plan is, of course, much less than the physical value which evidence showed could be placed on the B & P properties. The primary consideration, of course, is not this physical value, but the earning capacity of the property. This involves a consideration of many factors which will affect the capacity of the property, whatever its intrinsic physical value, to produce earnings. Such matters as the expected volume of business, the effect of competition from other forms of transportation, the relative volume of freight and passenger traffic, the type of commodities to be carried, and the general business conditions of the area served must be considered. As to these factors, studied by the Commission in the course of these lengthy proceedings, the Commission with its expert knowledge of the railroad industry is best fitted to judge.[9]

9. In connection with the accuracy of the Commission's appraisal of these factors it might be noted that the Commission in connection with the New Haven reorganization estimated that the annual income available for fixed charges in the future for the New Haven system (including the B & P line) would be $13,388,674. Actual experience for ten years since the war shows the annual average of such income has been $13,368,030, or only about $20,000 a year less than the Commission's estimate.

■ The attack of the objectors on this aspect of the plan boils down to the claim that since there were no figures as to actual earnings in recent years, and since the Commission evidently gave little weight to expert testimony offered by the stockholders as to earning power, the Commission had no evidence on which to base a finding of value. Accurate evidence of actual recent earnings would, of course, be helpful. But actual current earnings are not the standard. The real criterion is earning power. Actual earnings in any year are only one factor, to be considered with many other factors in a determination of long-run earning capacity.

In the present proceeding, the operations of B & P and New Haven are so intermingled that any figure as to the earnings or deficit on the operations of B & P in any year depends on what method is used to apportion to B & P its proper share of the expenses and earnings of the New Haven system. If the New Haven had continued to keep its accounts with B & P under the segregation formula, the figures would undoubtedly have been disputed by the objectors. It is unlikely that they could have added much in the light of the limited effect which the Commission gave to the segregation formula. The expert testimony presented by the stockholders was, of course, based on the specific views of the expert as to how the B & P and New Haven earnings and expenses should be allocated between the two roads. The Commission was not bound to accept his theory of allocation, and, hence, could properly have rejected the results based on it.

■ The valuation placed on the debtor's properties is thus the result of a consideration of a great many factors influencing the value of the properties. Value necessarily involves many imponderables. As was pointed out by Judge Hincks, in approving the New Haven reorganization plan, the valuation of the B & P involved many elements to which it was impossible to assign precise money values, and the result is "'essentially a matter of judgment based upon a consideration of many intangible elements and a general knowledge of system requirements.'" In re New York, N. H. & H. R. Co., D.C., 54 F.Supp. 595, 620. Such a judgment is one which the Commission is especially fitted to make, and it is the agency chosen by law to make it. The Commission's judgment in this case was based upon material and substantial evidence and arrived at in accordance with legal standards. As such it must be accepted by this court.

### Treatment of Claims.

The third contention of the opponents of the plan is that it is invalid as involving a forced compromise of claims without the consent of interested parties and without evidence respecting, or appraisal of, the claims settled.[10]

New Haven asserts a claim against B & P for alleged losses incurred in the operation of B & P's properties for the account of B & P. B & P asserts a claim against New Haven for damages for breach of lease arising out of New Haven's rejection of the B & P lease. The plan provides that these claims shall be mutually cancelled. In the reorganization of Terminal, the claims of Terminal interests were assigned to New Haven. New Haven is willing in connection with this plan and in the interest of an expeditious reorganization that such claims shall be considered as waived.

■ The adjudication of these claims as to validity and exact amount is beyond the jurisdiction of the Commission and would require a delay in these proceedings while the claims were litigated in the court having jurisdiction—the

10. In the proposed plan of the Freeman committee filed before the resumption of hearings before the Commission in 1951 in which it was proposed that B & P lease its properties to New Haven, there was a provision for the mutual cancellation of all claims. Fourth Supplemental Report, 290 I.C.C. 375.

District Court in Connecticut for the administration and breach of lease claims under the jurisdiction reserved by it in the final decree in the New Haven reorganization proceedings, and this court for the Terminal claims, if litigation of these should become necessary. Such litigation would delay this reorganization for years. Adjudication of these claims, however, is not a prerequisite to approval of a plan by the Commission. The Commission in appraising the debtor's properties and the price to be paid for them may value these claims, " * * * even when that involves the validity and amount of the claims, and when it depends upon questions of law, to which the Commission's specialized skill and experience do not extend." Judge Learned Hand, concurring in Old Colony Bondholders v. New York, New Haven & H. R. Co., 2 Cir., 161 F.2d 413, 429. It is not necessary for the Commission to state a specific value for each claim, but only that the value should be reflected in the over-all valuation of the properties.

Of course, in making this valuation, as with other matters of valuation, the Commission must decide upon substantial evidence and in accordance with the proper legal standards. It cannot approve the provision for mutual cancellation of the claims solely upon grounds of expediency and a desire to avoid lengthy litigation. Without going into all the evidence which must be needed for a complete adjudication of the claims, there should be a consideration of the nature of the claims, the legal theories on which they are based, and the probabilities of what would ultimately be recovered if these claims were litigated to a final conclusion. In reviewing the Commission's action upon the claims, it will be appropriate to set out in a little more detail the nature of the claims and the contentions with respect to them, upon which the Commission's action could be based.

The New Haven asserts that its administration claim through 1948 amounted to over $17,000,000. This is based on calculations made under the segregation formula. On the same basis, New Haven contends that an accounting for operations during the years subsequent to 1948 would raise the total of its claim to a much larger amount. The B & P stockholders, of course, strongly contest the amount of the claim since they contend that the segregation formula is unfair and should not be applied in calculating the New Haven claim.

The stockholders assert a breach of lease claim in excess of $50,000,000. Included in that claim is an item for any amount recoverable by New Haven on its administration claim, on the ground that New Haven's operation of B & P and any resultant loss incurred by New Haven are the consequences of New Haven's rejection of the lease. They also contend that any amount recovered by New Haven on its Terminal claims against B & P should likewise be included as an item of damages for breach of the lease. On their theory any recovery by New Haven on its claims would be exactly offset by corresponding items in B & P's recovery on its breach of lease claim, and the only result would be a net recovery by B & P of the amount of the other items, such as loss of rentals, included in its breach of lease claim.

New Haven, however, contends that any amount recovered by it on its administration claim would constitute a prior lien on the assets of B & P.[11] Consequently, litigation of this claim could result in a recovery by New Haven

11. In the New Haven reorganization proceedings similar administration claims against Old Colony, calculated by the use of the same segregation formula, were held by Order No. 300 to be "an expense of administration prior to any mortgage or other lien thereon." A similar holding was also made as to New Haven administration claims against B & P by Order No. 301, reversed on other grounds, Palmer v. Warren, 2 Cir., 108 F.2d 164, 169.

of an amount greater than all the assets of B & P, with the claim to be satisfied out of these assets prior to the claims even of the bondholders. On the other hand, it contends, any recovery by B & P on its claims against New Haven would rank only as an unsecured claim, and the most that B & P could ever actually collect would be its share of the stock set aside by the New Haven reorganization plan to meet the unliquidated common claims against New Haven.

Another fact to be considered is the stipulation entered into in 1941 between the trustees of B & P and the trustees of New Haven fixing the amount of B & P's breach of lease claim at $10,000,-000, and the amount of New Haven's administration claim from June 3, 1936 to December 31, 1939 at $7,000,000. This stipulation was stated to be made for the purposes of evaluating said claims in connection with the pending plans, and any future modifications thereof not affecting the provisions for the cancellation of said two sets of claims, and for voting upon said plans. This stipulation was approved by the Connecticut court on May 22, 1941 and by this court on June 30, 1941.[12] Without passing on the question of whether or not this stipulation is still binding upon the parties, it is still relevant as an indication of the valuation seriously placed on these claims by the parties at that stage of the proceedings and, as such, at least, was properly taken into account by the Commission. In this connection, it should be pointed out that it is contended that, except for the inclusion of an item corresponding to the administration claim, all other items of damage for the breach of lease were ascertainable as of the time of the stipulation, since B & P immediately upon the breach of the lease could have recovered in full its damages for the remainder of the term.

█ The Commission was, of course, thoroughly familiar with these facts and contentions with regard to these claims. It clearly appears that it had before it sufficient evidence upon which to base a reasonable valuation of the claims. It was justified in denying the petition of the stockholders' committee to reopen the proceedings for receipt of detailed evidence as to certain aspects of these claims. The Commission appears to have carefully considered all the relevant factors in arriving at its conclusion that mutual cancellation of these claims, in conjunction with the other elements of the plan, would produce a result fair and equitable to all the parties concerned. There is no showing that the Commission in arriving at this conclusion violated any applicable legal standard. This court accepts the Commission's treatment of these claims as within its powers, and as being fair and reasonable. Cf. Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 130, 60 S.Ct. 1, 84 L.Ed. 110; In re Boston Terminal Co., D.C., 99 F. Supp. 916, 919, 922.

█ Certain stockholders also contend that the plan, by providing for sale of the B & P properties to New Haven, involves a forced merger such as that held beyond the power of the Commission in St. Joe Paper Co. v. Atlantic Coast Line R. Co., 347 U.S. 298, 74 S.Ct. 574, 98 L.Ed. 710. The Supreme Court in that case, however, held only that the Commission lacked the power under § 77, sub. b(5) of the Bankruptcy Act to initiate a merger or consolidation of two carriers, not that it could not approve such a consolidation when voluntarily proposed by the carriers themselves. St. Joe Paper Co. v. Atlantic Coast Line R. Co., supra, 347 U.S. at pages 306, 309, and footnote 12, 74 S.Ct. at page 574, 580. In this case a sale of the B & P properties has been contemplated by all parties from the beginning of these proceedings, and provisions for such a sale were included in the plans originally proposed both by the debtor and by the stockholders' com-

---

12. New Haven waives all administrative claims against B & P subsequent to the date of the stipulation.

878

mittee. Report of Commission, 239 I.C.C. 465, 467, 471. Actually, the proposed sale is the only feasible solution to the debtor's problems, and the real opposition appears to be not to the sale, as such, but to the price to be paid by New Haven.

After full consideration of the plan and the various objections thereto, the court concludes that the plan is fair and equitable, affords due recognition to the rights of bondholders and stockholders and otherwise fully complies with the requirements of § 77 of the Bankruptcy Act.

An order will issue approving the plan and a certified copy of this opinion and order will be sent to the Interstate Commerce Commission.