In the Matter of the NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Debtor.

The CHASE MANHATTAN BANK (N. A.), as Trustee under the Debtor's General Income Mortgage dated July 1, 1947, the Committee for the Holders of the Debtor's First and Refunding Mortgage Bonds and Oscar Gruss & Son, Appellants,

Richard Joyce SMITH and William J. Kirk, as the Trustees of the Debtor's Property, Appellees.

No. 387, Docket 31082.

United States Court of Appeals
Second Circuit.

Argued May 2, 1967.

Decided May 29, 1967.

Joseph Schreiber, Wilkie Bushby, New York City (Dewey, Ballantine, Bushby, Palmer & Wood, New York City), for Chase Manhattan Bank (N.A.) as Corporate Trustee under Debtor's General Income Mortgage.

Myron D. Isaacs, New York City (Nathan D. Lobell, New York City, of counsel), for Oscar Gruss & Son.

Lester C. Migdal, New York City (Migdal, Low, Tenney & Glass, New York City, Lawrence W. Pollack, New York City, of counsel), for New York, New Haven & Hartford Railroad Co. First Mortgage 4% Bondholders Committee.

Joseph Auerbach, Arthur Blasberg, Jr., Robert G. Bleakney, Jr., Thomas E. Weesner and Morris Baker, Boston, Mass. (Robert W. Blanchette, James W. Grady, New Haven, Conn., and Sullivan & Worcester, Boston, Mass., of counsel), for appellees.

Before WATERMAN, FRIENDLY and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal from an order of Circuit Judge Anderson, who has continued to preside over the reorganization proceedings of The New York, New Haven and Hartford Railroad Company ("New Haven") under § 77 of the Bankruptcy Act in the District Court for Connecticut, is another facet of the growing controversy between the New Haven's Trustees and certain of its security holders, see Oscar Gruss & Son v. United States, 261 F.Supp. 386 (S.D.N.Y.1966), order vacated and cause remanded, 386 U.S. 776, 87 S.Ct. 1478, 18 L.Ed.2d 520 (May 8, 1967). The controversy finds its background in the proceedings long pending before the Interstate Commerce Commission, F. D. Nos. 21989 and 21990, for the merger of the New York Central Railroad Company into the Pennsylvania Railroad Company under the name of The Pennsylvania New York Central Transportation Company ("Penn Central"), in which the New Haven Trustees saw both a threat and an opportunity. The threat was that by the substitution of the Central for the New Haven as the Pennsylvania's preferred connection for New England the merger would deplete the already impoverished carrier under their management; the opportunity was that § 5(2) (d) of the Interstate Commerce Act empowered the Commission to condition approval of the merger on inclusion of the New Haven "upon equitable terms." In June, 1962, the reorganization court granted an unopposed petition of the Trustees to ask the Commission so to condition its approval. The Trustees' effort succeeded to the extent that the Commission included in its order of April 27, 1966, granting approval, a condition which we quote in the margin, 327 I.C.C. 475, 553.[1]

During the pendency of the Pennsylvania-New York Central merger proceedings the Trustees and the two companies had been negotiating terms for the New Haven's inclusion. The results were formalized first in a Memorandum dated February 5, 1965 and later in a definitive agreement dated April 21, 1966 and amended October 4, 1966. This provided for the sale of substantially all the property of the New Haven to Penn Central free and clear of all liens and encumbrances with certain minor exceptions. The consideration was to be 950,000 shares of Penn Central whose market price at the time of the argument of this appeal was around $60 per share, $8,-000,000 in cash, and $23,000,000 in divisional mortgage bonds,[2] all subject to adjustments which the contract set out in detail.[3]

---

1. "8. The Pennsylvania New York Central Transportation Company shall be required to include in the transaction all the New York, New Haven, and Hartford Railroad Company—the inclusion of passenger operations being subject to the findings and determinations of the Commission as set forth in Finance Docket No. 23831 issued simultaneously with this report—upon such fair and equitable terms as the parties may agree subject to the approval of the Bankruptcy Court and the Commission. Within 6 months after the date this report is served, the parties shall file with the Commission for its approval, a plan for such inclusion. In the event the parties are unable to reach an agreement (and subject to approval by the Bankruptcy Court) such inclusion shall be upon such fair and equitable terms and conditions as the Commission may impose.

\* \* \* \* \*

"Jurisdiction is hereby reserved for such purposes. Consummation of the merger by applicants shall indicate their full and complete assent to these requirements."

2. This figure was subject to reduction to the extent that Penn Central elected to assume Harlem River Bonds.

3. Significant items included provisions for decrease for any deficiency of the New Haven's annual expenditures for maintenance of way, structures and equipment from January 1, 1964, below 30% of annual railway operating revenues, and for depreciation on depreciable property acquired with the approval of Pennsylvania and Central subsequent to December 31, 1964; and for increase in the amount of deficits in freight service net railway operating income for the years 1965–67 subject to certain limitations.

In September 1966, the Trustees filed a further petition with the District Court. They recited the background we have narrated, the New Haven's large and growing deficits, and the insufficiency of internally generated cash to meet demands. In the Trustees' view inclusion of the New Haven's estate in Penn Central afforded "the only practicable means for reorganization of the Debtor that is consistent with the best interest of the public and of all parties interested in the Debtor's estate; and should be effected." They submitted that operations should be continued so long as such inclusion was possible; that proceedings to secure inclusion on the basis of the Amended Agreement should be promptly instituted by them; and that they should also file a plan of reorganization of a nature summarized in an Annex.

This plan departed from the usual form in providing for two discrete steps. The first step consisted of the sale of the New Haven's assets to Penn Central as provided in the Amended Agreement; only after consummation of this step would the Trustees file a specification of the terms to be accorded security holders by way of amendment. The Trustees indicated also that "in order to terminate as soon as possible the drain on the Debtor's assets from continued operation," their plan would request the Commission to find that "consummation of the first step," i. e., sale of the New Haven to Penn Central under the terms of the agreement, would not adversely and materially affect the interests of any class of creditors or stockholders within the meaning of § 77(e),[4] and that accordingly no vote of security holders would be required before carrying out this step; upon certification to this effect by the Commission, the Trustees would request the reorganization court to affirm this finding and to confirm the first step, which they would then consummate. The Trustees prayed that the court authorize them to proceed in line with their petition, to make necessary expenditures for the services of experts and others, and to find that inclusion of the New Haven's estate in Penn Central afforded the only practicable means of reorganization consistent with public and private interests and should be effected, and that operations should continue so long as this was possible of achievement.

The three appellants here, the Chase Manhattan Bank as Trustee under the New Haven's General Income Mortgage, a Committee for Holders of the Debtor's First and Refunding Mortgage Bonds, and Oscar Gruss & Son, holder of some $10,500,000 principal amount (approximately 14%) of such bonds, filed answers opposing in somewhat differing respects the relief sought by the Trustees. After a hearing at which evidence was taken and argument heard, Judge Anderson signed an order substantially in a form distributed by the Trustees' counsel at the opening of the hearing. This was narrower than the petition in some respects and broader in others. It found that inclusion was "a" rather than "the only" practicable means etc.; it added to the finding as to continued operation a proviso that this was "without prejudice to the right of any party upon a showing of changed circumstances to seek a reconsideration thereof";[5] it included a finding that the plan of reorganization proposed by the Trustees "constitutes a plan of reorganization within the provisions of Section 77 of the Bankruptcy Act"; and it embodied a finding that the propriety of the procedures proposed by the Trustees had been sufficiently established, *prima facie*, to justify the expenditures required. The ordering paragraphs authorized the

---

4. The plan filed with the Commission provides that liens, charges and encumbrances on the debtor's assets shall continue upon the assets of the reorganized company, retaining their previous order and rank.

5. We are informed that a hearing is to be held to determine whether the Supreme Court's decision of March 21, 1967, Baltimore & Ohio R.R. v. United States, 386 U.S. 372, 87 S.Ct. 1100, 18 L.Ed.2d 159, with respect to the Penn-Central merger, is such a changed circumstance.

Trustees to file their plan to make expenditures necessary to process it, and to comply with orders of the Commission in the Penn Central case or providing for the inclusion of the properties of the New Haven in Penn Central, subject to the court's reservation of jurisdiction to pass upon all such matters as might be necessary under § 77. The appeal is from that order.

Chase Manhattan mounts a series of attacks on the Trustees' proposal and the order authorizing its execution. It says that proposing only one step of a plan while leaving the rest in abeyance flouts the directions of § 77(b) that a plan of reorganization "(1) shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise," "(4) shall provide for fixed charges * * * in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof"; and "(5) shall provide adequate means for the execution of the plan * * *." It urges that, faced with so incomplete a plan, neither the Commission nor the reorganization court can carry out the duties imposed by § 77(d) and (e) to find that it "complies with the provision of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various

classes of creditors and stockholders." Still more importantly Chase Manhattan strenuously objects to the attempt to avoid a vote by anyone until after the sale is consummated. It argues with much persuasiveness that the provision in § 77(e) for dispensing with the vote of a class of creditors on a finding by the Commission and the court "that the interests of such class of creditors will not be adversely and materially affected by the plan," when read in context refers to situations where their interests are left undisturbed, e. g., by preservation of their liens on the debtor's property or by full satisfaction in cash,[6] and that the Trustees in effect are asking the judge to utilize the "cram-down" clause in § 77(e)[7] without the enlightenment of a vote. See St. Joe Paper Co. v. Atlantic Coast Line R. R., 347 U.S. 298, 331–332, 74 S.Ct. 574, 98 L.Ed. 710 (1954) (dissenting opinion of Douglas, J.). It says also, as we do not understand to be denied, that the Trustees' proposal neither is nor could properly be advanced under § 77(o), authorizing trustees of a debtor to "determine what lines or portions of lines of railroad and what other property of the debtor, if any, should be abandoned or sold during the pendency of the proceedings in the interest of the debtor's estate and of ultimate reorganization" and to petition for authority for such abandonment or sale—provisions which "look primarily, not to disposition of the assets of a railroad or to its total abandonment, but to its 'ultimate reorganization'" as a transportation entity with losing appendages shorn off. See In re Huntingdon & Broad Top Mountain R. R. & Coal Co., 213 F.2d 411, 416 (3 Cir. 1954). The Bondholders Committee and Gruss echo these contentions and make some others,

6. See, as to the comparable provision in Chapter X, 6 Collier, Bankruptcy ¶2.21 (1965 rev.).

7. This provides that in the event of failure to achieve the required two thirds assent of any class, "the judge may nevertheless confirm the plan if he is satisfied and finds, after hearing, that it makes adequate provision for fair and equitable treatment for the interests or claims of those rejecting it; that such rejection is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts; and that the plan conforms to the requirements of clauses (1) to (3), inclusive, of the first paragraph of this subsection (e)."

notably that any plan for forcing a sale of the New Haven to Penn Central is inconsistent with the majority opinion in St. Joe Paper Co. v. Atlantic Coast Line R. R., 347 U.S. 298, see particularly 309 n. 12, 74 S.Ct. 574 (1954).

The Trustees answer that however such arguments might stand in the usual case, they fail to take account of the special problems of the New Haven, which during the trusteeship has operated at staggering losses, has procured enough cash for its necessities only through repeated rescue operations by the states it serves and the United States, and in their view cannot continue as an independent railroad even without passenger service. While pointing out that the second step of their plan will contain further and final provisions contemplated by the mandatory clauses of § 77(b), they say that the first step of the plan as proposed sufficiently meets these requirements: the rights of creditors are modified or altered within the meaning of clause (1) by being transferred from the New Haven's railroad property to the proceeds of the sale; the thrust of clause (4) is to guard against fixed charges that are unduly high,[8] not to require fixed charges by a railroad which will simply distribute the proceeds of a sale; and their plan does provide adequate means for execution. They cite cases authorizing the sale of wasting assets in Chapter X proceedings, notably In re V. Loewer's Gambrinus Brewery Co., 141 F.2d 747 (2 Cir. 1944), which relied on § 115, giving the court the same powers as if it had appointed a receiver in equity —powers also conferred by § 77(a)—as well as on § 116(3), authorizing the lease or sale of any property of the debtor. They seek to distinguish St. Joe on the alternative bases of the Commission's having here already acted under § 5(2) (d) and of the initiation of the merger proposal by the Trustees as in their view the only means to allow a failing railroad to continue its public service rather than by the Commission as the most favorable

solution for creditors of a railroad able to continue on its own; there may also lurk in the background the hope, which we would think not wholly unwarranted, that Mr. Justice Douglas' forceful dissent for three Justices in that case rather than Mr. Justice Frankfurter's opinion for four may represent the law of the future.

Appellants in reply distinguish the *Loewer's Gambrinus* and similar Chapter X cases on the basis that these dealt with perishable property, which they insist the New Haven would not be if only it were freed from the incubus of passenger operation or from public service altogether, and that the sales, in *Loewer's Gambrinus* to the highest of three bidders, were thus clearly the most advantageous financial arrangement for the creditors whereas sale of the New Haven to Penn Central may not be. They point out also that § 116(3), unlike § 77(o), does not require that a sale be made in aid of a reorganization.

Interesting and significant as these issues are, we think decision of them at this juncture would be premature. The Trustees' Plan is simply a suggestion to the Commission, the making of which inflicted no legal injury on the appellants. "Under § 77 the Commission is the chief architect of any plan of reorganization." St. Joe Paper Co. v. Atlantic Coast Line R. R., *supra*, 347 U.S. at 322, 74 S.Ct. at 587 (dissenting opinion of Douglas, J.); see also Ecker v. Western Pac. R. R., 318 U.S. 448, 468, 63 S.Ct. 692, 87 L.Ed. 892 (1942). As a result of the decision in Baltimore & Ohio R. R. v. United States, *supra*, and its probable sequelae, it is by no means certain that there ever will be a Penn Central in which the New Haven can be included. At the very best the time-table envisioned by the Trustees in September, 1966, wherein Penn Central would almost surely be ready to receive the New Haven as soon as the concurrent proceedings under § 5(2) (d) and under § 77 with respect to

8. See Friendly, The 1935 Amendment of the Railroad Reorganization Act, 36 Colum.L.Rev. 27, 39 (1936).

the "first step" were completed, has been thrown badly out of kilter. The Commission may well decide that if consummation of the Penn Central merger must be deferred until any order it may make for inclusion of the Erie-Lackawanna, the Delaware & Hudson, and the Boston & Maine in the Norfolk & Western System has survived judicial review, prudence alone would dictate the formulation of a more nearly conventional plan of reorganization for the New Haven. We are not as impressed as the Trustees with the difficulties in preparing such a plan, at least under the slower time-table that must now be contemplated. The time required to be spent in preparing an orthodox plan would hardly equal that needed to defend an unorthodox one, not to speak of the latter's hazard of failure at the end of a long path of judicial review. As a consequence of its prior reorganization the New Haven's mortgage structure is extremely simple—a single divisional issue and two layers of system mortgage bonds, in addition to the usual equipment trust obligations. In such circumstances the allocation of securities among bondholders creates little difficulty, see Friendly and Tondel, The Relative Treatment of Securities in Railroad Reorganizations under Section 77, 7 Law & Contemp. Problems, 420, 427 (1940), especially so when cash and marketable securities are all that need to be divided. While identification and ranking of priority claims may not be a simple matter, see 5 Collier, Bankruptcy ¶ 77.21 (1965 ed.), the problem is somewhat alleviated by the admonition in § 77(c)(7) against "separate classification unless there be substantial differences in priorities, claims, or interests"; and those who prepare plans under § 77 today have the benefit of more than thirty years of experience under that statute in addition to the earlier history in equity. A complete plan would permit a vote to be taken, surely a desirable thing even if, as we rather doubt, the Trustees are right in saying it is not requisite, without precluding a cram-down in the event the needed majority is not obtained and the

court finds the facts warrant such action. Since we thus are by no means certain the plan the Commission and the court will approve—if, indeed, circumstances permit their approving any—will contain the features to which appellants object, we think it improper to pass upon their objections at this time.

■ Appellants are on solid ground, however, in arguing that if we should simply approve the order as entered, the Commission might be left with the misapprehension that we had endorsed the validity of the Trustees' two-step plan without a vote on the first step, and, if the Commission were to act on that basis, the District Court and this court might feel obliged to apply all the findings as the law of the case. The order the Trustees persuaded the judge to sign went far beyond their necessities. All they needed was authority to spend money in initiating proceedings before the Commission under § 5(2)(d) of the Interstate Commerce Act and § 77 of the Bankruptcy Act and to keep operating the railroad in the meanwhile; there was no occasion to involve Judge Anderson or us in an advisory opinion to the Commission on legal issues that may never arise. Accordingly we direct that the order be modified to read in the form annexed as an Appendix; as so modified, it is affirmed. No costs.

### APPENDIX

ORDER AUTHORIZING TRUSTEES TO FILE WITH THE INTERSTATE COMMERCE COMMISSION A REORGANIZATION PLAN WHEREBY AN INCLUSION OF SUBSTANTIALLY ALL THE PROPERTIES OF THE DEBTOR IN THE PENNSYLVANIA NEW YORK CENTRAL TRANSPORTATION COMPANY WILL BE EFFECTED BY A SALE THEREOF

The petition of the Trustees for Order No. 404 herein having been duly noticed in accordance with the Order of Notice of this Court dated September 13, 1966; having come on for hearing on October 10, 1966; all parties in interest having been heard or given opportunity to be heard at said hearing; and the Court,

being duly advised in the premises, finding as follows:

(a) The inclusion of the Debtor's estate in Pennsylvania New York Central Transportation Company (Penn-Central), as provided by the Interstate Commerce Commission (Commission) in its order of April 6, 1966, in Finance Dockets Nos. 21989 and 21990, may afford a practicable means for reorganization of the Debtor; and

(b) Under the present circumstances, railroad operations should be continued as long as such inclusion appears to afford a practicable means for a reorganization of the Debtor, provided, however, that this finding is made without prejudice to the right of any party, for good cause shown, to seek reconsideration thereof:

It is ordered, adjudged and decreed that:

1. The Trustees be, and they hereby are, authorized to file with this Court and the Commission the Trustees' Plan, with terms and provisions substantially as provided in Annex 1 to their petition, but in such detail as they consider necessary or appropriate in order to provide fully for the objectives set forth in Annex 1;

2. The Trustees be, and they hereby are, authorized to employ experts and other persons and to make expenditures to prosecute the proceeding in Finance Dockets Nos. 21989 and 21900 for the inclusion of the Debtor in Penn-Central and the proceeding to be initiated by them before the Commission for the approval of a plan under Section 77 of the Bankruptcy Act, provided, however, that this Court hereby reserves jurisdiction to pass upon such expenditures as provided in the Trustees' petition;

3. The Trustees be, and they hereby are, authorized to take such steps as they deem necessary or appropriate or desirable in order to comply with and carry out the terms of the order dated April 6, 1966 of the Commission in Finance Dockets Nos. 21989 and 21990, and of such further orders as the Commission may enter therein, or in the proceeding to be initiated by the Trustees for the approval of a plan under Section 77 of the Bankruptcy Act, provided, however, that this Court hereby reserves jurisdiction to pass upon all such matters as may be necessary in accordance with Section 77 of the Bankruptcy Act.